# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00198-CV

**Milton R. Oliver and Vicky L. Oliver, Appellants**

**v.**

**Alexander Ortiz and Regina Lauricella, Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT
## NO. D-1-GN-05-004591, HONORABLE DARLENE BYRNE, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Milton R. and Vicky L. Oliver appeal from a district court judgment awarding damages and attorney's fees to Alexander Ortiz and Regina Lauricella[1] on claims relating to appellants' sale to appellees of a business, "Oliver's Country Store," located in Red Rock, Bastrop County.[2] The judgment was based on jury findings that Milton or Vicky Oliver had violated the Texas Deceptive Trade Practices Act in connection with the sale. Appellants contended at trial that appellees had induced them into the transaction by misrepresenting and concealing material facts about the business and property, causing them to lose the value of their investment. On appeal, appellants contend that appellees cannot recover on these claims as a matter of law because appellees

---

[1] Ortiz and Lauricella are husband and wife. We will refer to the parties collectively as "appellants" and "appellees" for clarity.

[2] Appellants describe Oliver's Country Store as "as general country store with gas pumps, car wash, areas for groceries, feed store items and hardware for sale. There was the convenience store area, an area where food could be cooked, served and eaten and a game room area, as well."

purchased the business and property "as is," thereby negating the element of causation as a matter of law. *See Prudential Ins. Co. v. Jefferson Assoc., Ltd.*, 806 S.W.2d 156, 161-62 (Tex. 1995). For the reasons explained herein, we will affirm the judgment.

In November 2003, appellants had purchased the real property on which the store was located from Pat and Henrietta Meuth. Appellants paid the Meuths cash and executed a $225,000 note secured by a vendor's lien and a deed of trust on the real property and the store's machinery, equipment, furniture, fixtures, supplies, inventory, proceeds of and after-acquired collateral. Among other rights under the agreements, the deed of trust stated that the Meuths could declare the debt immediately payable and invoke remedies for default if appellants transferred any of the property securing the debt without the Meuths's consent to a person other than a "permitted transferee," which were generally limited to appellants' immediate family or entities under their ownership or control.

In September 2005, appellants placed a classified advertisement in the *Austin American-Statesman* stating, "General Store w/car wash on 3.5 ac in Bastrop area," and listing a contact phone number. On September 20, Ortiz responded to the ad. A series of conversations—mostly by telephone—followed between appellants and appellees, chiefly Ortiz and Milton Oliver. The parties dispute the content of these conversations. Appellees claimed that appellants repeatedly represented that the store had been grossing between $30,000 and $40,000 per month and netting profit of $2,000 per month. Appellants contended that they had indicated only that the store *could* make that much money, and had on occasion. Appellants also complained that appellees had refused to show them the store's books.

The parties closed the transaction only ten days later. Ortiz testified at trial that he had purchased and sold real estate in the past and had also purchased, operated and sold various businesses. He did not seek legal counsel or outside opinions prior to purchase, explaining that "[i]n the beginning I consulted lawyers and expert opinions" but "later on I got better at it [and] I relied less and less on their expertise because in my personal experience dealing with an expert in business does not guarantee it will make a good investment or not. So I relied more and more on my own personal experience, and it has worked for me in the past." Ortiz testified that when purchasing a business, he focused primarily on anticipated revenues. Relying on the representations regarding the store's profitability that he alleged appellants made, Ortiz calculated that he could earn a suitable return on his investment. He added that it was not unusual for him to conclude such a transaction within ten days.

At closing, appellees paid appellants $180,000 in cash. The parties executed a "Commercial Lease" whereby appellees agreed to lease the store premises from appellees in exchange for monthly rent payments of approximately $1,500 for 157 months—$220,000 total—with the right to purchase the property at an amortized price. Appellees were also provided a "Bill of Sale" for the "Transferred Properties," defined as "Entire Inventory consisting of foodstuffs, perishable items, dry-goods, non-alcoholic beverages and all other items for resale o[n] the premises as of the date hereof." Of relevance to this appeal is the following provision of the Bill of Sale:

WITH THE EXCEPTION OF THE WARRANTIES OF TITLE, INCLUDING THE WARRANTY THAT NO LIENS EXIST ON THE TRANSFERRED PROPERTIES EXCEPT AS RECITED, SELLER [the Olivers] HAS MADE NO AFFIRMATION OF FACT OR PROMISE RELATING TO THE TRANSFERRED PROPERTIES THAT HAS BECOME ANY BASIS OF THE BARGAIN, AND FURTHER, SELLER HAS MADE NO AFFIRMATION OF FACT OR PROMISE RELATING TO THE TRANSFERRED PROPERTIES THAT WOULD CONFORM TO ANY SUCH AFFIRMATION OR PROMISE. SELLER DISCLAIMS ANY WARRANTY OF FITNESS FOR ANY PARTICULAR PURPOSE WHATEVER WITH RESPECT TO THE TRANSFERRED PROPERTIES. THE TRANSFERRED PROPERTIES ARE SOLD ON AN "AS IS" BASIS.

Also pertinent are the following provisions of the Commercial Lease:

8.    CONDITION OF PREMISES.  Tenant [appellees] has examined and accepts the leased premises and personal property in the present as is condition as suitable for the purposes for which the same are leased.

\*   \*   \*

33.    PRIOR AGREEMENTS SUPERCEDED.  This agreement constitutes the sole and only agreement of the parties to this lease and supersedes any prior understandings or written or oral agreements between the parties respecting the subject matter of the lease.

Appellees began operating the store.  Within a week or two, according to appellees, they ascertained that store revenues were not close to what they contended appellants had led them to believe.  A further complication arose when appellees were informed by the Meuths that, as appellees understood it, the Meuths had the right to void the entire transaction because appellants

4

had not obtained their permission to convey the property to appellees.[3] Appellees claim that they attempted to raise these concerns with appellants, who purportedly responded with the general view that a "deal's a deal." Alexander Ortiz testified that, fearing he would soon lose the store to the Meuths, he began deeply discounting the store's inventory in an attempt to sell it and recoup at least some of appellees' investment. Ortiz added that, resigned to the fate he anticipated, he let the store's insurance lapse, did not replenish inventory, and planned to default on his November rent payment. On Saturday, October 29, Milton Oliver entered the store premises, had the locks changed, and excluded appellees from the premises. By this time, the store's shelves were virtually empty.

Appellees subsequently sued appellants for damages, alleging theories of statutory and common-law fraud, DTPA violations, and breach of contract. These claims were tried to a jury. Appellees' basic theme at trial was that they were misled by appellants regarding the store's profitability and the possibility that the Meuths could foreclose. Appellants denied any such conduct. They added that appellees—whom they characterize as "sophisticated real estate purchasers" and "business owners"—bought the store "as is," with minimal investigation, relying on their own experience from their prior similar transactions, and were simply inept in managing the store and in responding to their encounters with the Meuths.

The jury found for appellees on liability theories including statutory and common-law fraud, breach of contract, and DTPA violations. Regarding the DTPA claim, the jury found that Milton or Vicky Oliver had engaged in a false, misleading and deceptive act or practice on which appellees had relied and that was a producing cause of damages to them, and had failed to comply

---

[3] The Meuths did not testify.

5

with an express warranty that was a producing cause of damages to them.[4]  Predicated on these findings, the jury awarded appellees $120,000 in benefit-of-the-bargain damages.  The jury further found that Milton or Vicky Oliver had engaged in such conduct knowingly and intentionally and awarded appellees $50,000 in additional damages, plus $15,000 each to Ortiz and Lauricella for mental-anguish damages.  The jury apportioned responsibility for the DTPA damages sixty percent to Milton Oliver and forty percent to Vicky Oliver.  However, the jury found in favor of appellants on the following issue, numbered Special Issue No. 8 in the charge:

> Did Alexander Ortiz and Regina Lauricella buy the business and the property "As Is"?
>
> "As Is" means the seller gives no assurances, express or implied, concerning the value or condition of the thing sold.

Appellees moved for judgment on the verdict, electing to recover on their DTPA claim.  Appellants moved to disregard the jury's liability and damage findings under the DTPA and fraud theories on the basis that they were rendered immaterial by the jury's finding in Special Issue No. 8 that appellees had purchased the business and property "as is."  Appellees relied on the rule that an agreement to purchase property "as is" negates causation, as a matter of law, on claims predicated on acts or omissions relating to the property's condition or value.  *See Prudential Ins. Co.*, 896 S.W.2d at 161-62; *Spring Windows Fashions Div., Inc. v. The Blind Maker*, 184 S.W.3d 840, 868-71 (Tex. App.—Austin 2005, writ dism'd by agr.).  The district court rendered

---

[4]  However, the jury found that the neither Milton or Vicky Oliver had engaged in an unconscionable action or course of action that was a producing cause of damages to appellees.

judgment on the verdict awarding appellees a total of $80,000 from the Olivers, jointly and severally; an additional total of $120,000 from Milton Oliver; prejudgment interest on these awards; and attorney's fees in the amounts of $21,849 from the Olivers, jointly and severally, and $32,774.55 from Milton Oliver.

The Olivers appealed. In three issues, they contend that appellees cannot recover on their DTPA theories because appellees agreed to purchase the Oliver's Country Store "as is." "By agreeing to purchase something 'as is,' a buyer agrees to make his own appraisal of the bargain and to accept the risk that he may be wrong," and "[t]he seller gives no assurances, express or implied, concerning the value or condition of the thing sold." *Prudential Ins. Co.*, 896 S.W.2d at 161. This reflects the public policy that "[f]reedom of contract allows parties to bargain for mutually agreeable terms and allocate risks as they see fit." *Gym-N-I Playgrounds, Inc. v. Snider*, 220 S.W.3d 905, 912 (Tex. 2007). A valid "as is" agreement prevents a buyer from holding a seller liable under claims relating to the condition of the property conveyed because it is legally impossible for any injury to the buyer to have been caused by the seller; in effect, the "as is" agreement is an intervening and superseding cause of the buyer's injury. *Prudential Ins. Co.*, 896 S.W.2d at 161. Such an agreement thus operates to negate, as a matter of law, the causation element of claims relating to the condition or value of the property. *Id.*

Courts will give effect to "as is" agreements unless set aside. *Id.* An "as is" agreement may be avoided if it is fraudulently induced by misrepresentation or concealment of information by the seller. *See id.* at 162 ("A buyer is not bound by an agreement to purchase something 'as is' that he is induced to make because of a fraudulent representation or concealment

7

of information by the seller. . . . A seller cannot have it both ways: he cannot assure the buyer of the condition of a thing to obtain the buyer's agreement to purchase 'as is,' and then disavow the assurance which procured the 'as is' agreement."). Likewise, "a buyer is not bound by an 'as is' agreement if he is entitled to inspect the condition of what is being sold but is impaired by the seller's conduct." *Id.* "Other aspects of a transaction" may also make an "as is" agreement unenforceable, including (1) the sophistication of the parties, which may include whether a party is represented by counsel, (2) the terms of the "as is" agreement, (3) whether the "as is" agreement was freely negotiated, and (4) whether the agreement was an arm's length transaction. *Id.*; *Gym-N-I Playgrounds, Inc. v. Snider*, 158 S.W.3d 78, 85 (Tex. App.—Austin 2005), *aff'd*, 220 S.W.3d 905 (Tex. 2007).

Appellants rely primarily on the contractual disclaimers in the Bill of Sale and Commercial Lease. Appellees dispute whether these provisions are enforceable. However, before we address the implications or enforceability of these provisions as "as is" agreements, we must first consider whether, under ordinary rules of contract construction, they encompass or address the subject matter of the alleged misrepresentations or concealment made the basis for appellees' DTPA claims. *See Spring Windows*, 184 S.W.3d at 870-72. At least with respect to misrepresentations or concealment of facts relating to the store's profitability, we conclude they do not.

As noted, the jury heard evidence that appellants represented to appellees that the store had been grossing between $30,000 and $40,000 per month and netting a profit of $2,000 per month, and that revenues in fact turned out to be lower. The disclaimers in the Bill of Sale on which appellants rely were addressed solely to "*the Transferred Properties*" and "affirmations of fact or

8

promise" or warranties "*relating to the Transferred Properties.*" The Bill of Sale defined "Transferred Properties" to mean the "Entire Inventory consisting of foodstuffs, perishable items, dry-goods, non-alcoholic beverages and all other items for resale o[n] the premises as of the date hereof." In other words, the disclaimers in the Bill of Sale related to the condition of the store's inventory—e.g., were there insects in the food or had the milk spoiled—not how much money the business was making. Similarly, the subject matter of the Commercial Lease was limited to "the leased premises," defined as the real property where the store was located, plus "all trade fixtures, improvements and personal property on the leased premises."[5] The "as is" clause in the Commercial Lease thus addressed only the property where the business was located, not the profitability of the business itself. The contractual provision on which appellants rely does not address or encompass the alleged misrepresentations or concealment of facts regarding the profitability of Oliver's Country Store.

In addition to these contractual provisions, appellants suggest that the parties formed an oral "as is" agreement that is somewhat broader than the written ones.[6] They primarily emphasize the jury's finding in Special Issue No. 8. Special Issue No. 8 did not reference either of the written contractual provisions and was much broader in scope. It asked whether appellees bought "*the business and* the property 'As Is,'" further instructing the jury that "'As Is' means the seller

---

[5] This was "included, but not limited to, trade fixtures, equipment, furniture, kitchen equipment, grill, freezers, walk in cooler, gasoline pumps and tanks, television set, shelving, car wash equipment, propane tanks, air compressor, pool tables, juke box, and storage building."

[6] Neither party addressed any potential statute-of-frauds implications of an oral "as is" agreement in the context of a transaction such as the one at issue here, or any other issues, beyond those discussed above, bearing on the enforceability of such an arrangement. Our analysis above is limited to the arguments the parties have raised.

9

gives no assurances, express or implied, concerning the value or condition of the thing sold." (Emphasis added). The scope of Special Issue No. 8 corresponded to that of the district court's DTPA damages submission, which inquired as to "[t]he difference, if any, between the value of Oliver's Country Store as it was received and the price [appellees] paid for it." Special Issue No. 8 thus encompassed the subject matter of any alleged misrepresentation or concealment that could have been the basis for appellees' DTPA recovery.

Appellants suggest that because the jury found in Special Issue No. 8 that appellees had purchased the business and property "as is," appellees cannot recover DTPA damages. We cannot agree, at least as that issue was submitted here. Although Special Issue No. 8 inquired whether appellees had bought the business or property "as is," that term was defined solely in terms of whether appellants gave "*no assurances, express or implied, concerning the value or condition of the thing sold.*" In other words, Special Issue No. 8 inquired whether appellants *had not* made "assurances . . . concerning the value or condition" of the business. The jury was not asked whether the parties had *agreed* that the sale of the business was "as is." Thus, Special Issue No. 8, as submitted here, amounted to an inferential rebuttal to the DTPA liability issues, which inquired whether appellants *had* made representations or express warranties about the value or condition of the business.[7] *See Diamond Offshore Mgmt. Co. v. Guidry*, 171 S.W.3d 840, 844 (Tex. 2005)

---

[7] In its submission of appellees' DTPA laundry list theory, the district court instructed the jury that "false, misleading, or deceptive act or practice" meant:

> Representing that Oliver's Country Store had or would have characteristics, uses or benefits that it did not have; or

> Representing that Oliver's Country Store was or will be a particular standard, quality or grade if it was another; or

10

(citing *Select Ins. Co. v. Boucher*, 561 S.W.2d 474, 477 (Tex. 1978)) (defining inferential rebuttal as a question that "presents a contrary or inconsistent theory from the claim relied upon for recovery"). Consequently, appellants' contentions here ultimately amount to a complaint that the jury's affirmative findings on both sets of issues conflicted. Amid the heat of trial, however, neither party raised a conflict complaint before the jury was discharged. Under these circumstances, the district court did not err in rendering judgment on the jury's DTPA liability findings despite the jury's finding in Special Issue No. 8. *See Spring Windows*, 184 S.W.3d at 867; *see also St. Paul Fire & Marine Ins. Co. v. Murphree*, 357 S.W.2d 744, 541 (Tex. 1962).[8]

------

> Representing that an agreement confers or involves rights or obligations that it did not have or involve; or

> Failing to disclose information about Oliver's Country Store that was known at the time of the transaction with the intention to induce Alexander Ortiz and Regina Lauricella into a transaction that they otherwise would not have entered into if the information had been disclosed.

In its breach-of-warranty submission, the district court instructed the jury that:

> An express warranty is any affirmation of fact or promise made by Milton Oliver or Vicky Oliver that relates to Oliver's Country Store and becomes part of the basis of the bargain. It is not necessary that formal words such as "warrant[y]" or "guarantee" be used or that there be a specific intent to make a warranty.

[8] *Cf. Billy Smith Enterp., Inc. v. Hutchison Constr., Inc.*, No. 03-06-00689-CV, ___ S.W.3d ___, 2008 Tex. App. LEXIS 5556 at *7-19 (Tex. App.—Austin July 23, 2008, no pet. h.) (jury finding of affirmative contractual defense negated liability predicated on existence of contractual payment obligation). Here, the jury's finding in Special Issue No. 8 does not render the jury's DTPA liability findings legally immaterial, but represents an inconsistent finding regarding the same material facts.

11

We overrule appellants' issues and affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices Pemberton and Waldrop

Affirmed

Filed:   August 5, 2008