GYM–N–I PLAYGROUNDS,
INC., Petitioner,

v.

Ron SNIDER, Respondent.

No. 05–0197.

Supreme Court of Texas.

Argued Sept. 27, 2006.

Delivered April 20, 2007.

Rehearing Denied June 1, 2007.

Christopher A. Fusselman, The Fusselman Law Firm, Gus D. Oppermann V, Folger, Wheat & Opperman, L.L.P., Houston, for Petitioner.

William H. Ford, Cathleen M. Stryker, Ruth G. Malinas, Kathy H. Kang, Ball & Sweet, P.C., San Antonio, for Respondent.

Sylvia Ann Mayer, Amicus Curiae, Well, Gotshal & Manges LLP, Houston, for Pacific Legal Foundation.

Chief Justice JEFFERSON delivered the opinion of the Court.

Commercial real estate landlords impliedly warrant that their premises are suitable for the tenants' intended commercial purposes. In this case, however, the tenants expressly disclaimed that warranty. We must decide whether the disclaimer precludes the tenants' suit against the landlord for breach of the warranty. We also decide whether the tenants' agreement to lease the commercial building "as is" prevents them from suing the landlord for other claims based on the property's condition. We answer both questions "yes" and affirm the court of appeals' judgment.

## I

### Background

In 1981, Ron Snider founded Gym–N–I Playgrounds, Inc., a playground equipment manufacturing company. The business grew rapidly. In 1983, Snider purchased six acres of land in New Braunfels and subsequently constructed a 20,075 square foot building for the business. By the late 1980s, Gym–N–I employed about twenty people, including Bonnie Caddell and Patrick Finn, to whom Snider later sold the business. Caddell was Gym–N–I's bookkeeper; Finn performed miscellaneous jobs including assembling and installing playgrounds, maintaining machinery, purchasing supplies, and managing human resources.

The City of New Braunfels' fire code requires owners to install sprinkler systems for any building exceeding 20,000 square feet if the building contains certain combustible materials. GymN–I's building exceeded that threshold, and the fire marshal recommended, but did not require, that the building have a sprinkler system. Both Caddell and Finn knew that the fire marshal's recommendation was never implemented.

Eventually, Finn and Caddell purchased the business, and Snider leased them the building. Each party was represented by counsel during the lease negotiations. Finn and Caddell decided not to inspect the premises before leasing because, as Caddell testified, they "knew more about the building" than anyone else.

The lease provided that Gym–N–I would: (1) accept the building "as is," ex-

pressly waiving all warranties;[1] (2) obtain insurance on the building to cover fire-related loss;[2] and (3) perform maintenance and repairs.[3] The lease also contained a holdover provision.[4]

The lease was signed on September 30, 1993, and the original term expired in September of 1996. The parties did not execute a new instrument, but Gym–N–I continued to pay and Snider continued to accept monthly rent checks. On August 10, 2000, a fire destroyed the building.

## II

### Procedural History

Snider's insurer, American Economy Insurance Company, paid him approximately $400,000 for the loss of the building. Gym–N–I received nearly $1,000,000 under its insurance policy covering the building's contents and business interruption. Thereafter, American Economy brought a subrogation suit against Gym–N–I, which filed cross-claims against American Economy and third-party claims against Snider. Ultimately, all parties other than Gym–N–I and Snider were dismissed prior to this appeal.

Gym–N–I's suit against Snider alleged that defective electrical wiring and the lack of a sprinkler system caused the fire.[5] Snider's summary judgment motion argued that all of Gym–N–I's claims, except the breach of contract claim, were barred by the "as is" clause and warranty dis-

1. *ACCEPTANCE OF PREMISES:*
   (a) Tenant [Gym–N–I] accepts the Premises "as is." *LANDLORD [Snider] HAS NOT MADE AND DOES NOT MAKE ANY REPRESENTATIONS AS TO THE COMMERCIAL SUITABILITY, PHYSICAL CONDITION, LAYOUT, FOOTAGE, EXPENSES, OPERATION OR ANY OTHER MATTER AFFECTING OR RELATING TO THE PREMISES AND THIS AGREEMENT, EXCEPT AS HEREIN SPECIFICALLY SET FORTH OR REFERRED TO AND TENANT HEREBY EXPRESSLY ACKNOWLEDGES THAT NO SUCH REPRESENTATIONS HAVE BEEN MADE. LANDLORD MAKES NO OTHER WARRANTIES, EXPRESS OR IMPLIED, OF MERCHANTABILITY, MARKETABILITY, FITNESS OR SUITABILITY FOR A PARTICULAR PURPOSE OR OTHERWISE, EXCEPT AS SET FORTH HEREIN. ANY IMPLIED WARRANTIES ARE EXPRESSLY DISCLAIMED AND EXCLUDED.* * * *
   (e) *THE REPRESENTATIONS, WARRANTIES, COVENANTS, TERMS, CONDITIONS, AND WAIVERS SET FORTH IN THIS SECTION SHALL SURVIVE THE TERMINATION OF THE LEASE.*

2. Paragraph fourteen of the lease required Gym–N–I to insure "all buildings and improvements on the Leased premises ... against loss or damage by fire."

3. *MAINTENANCE OBLIGATIONS OF TENANT.* Tenant covenants and agrees, at Tenant's sole cost and expense, to perform all maintenance and repairs of the Premises and to repair or replace any damage or injury done to the Premises, or any part thereof, caused by any reason, except the gross negligence of Landlord. All such maintenance and repairs shall restore the Premises to the same or as good a condition as existed prior to such injury or damage and shall be effected in compliance with all building and fire codes and other applicable laws and regulations.

4. *HOLDING OVER:* Any holding over without written consent of Landlord shall constitute a lease from month-to-month, under the terms and provisions of this Lease to the extent applicable to a tenancy from month-to-month ...

5. Gym–N–I sued for negligence, negligence per se, gross negligence, Deceptive Trade Practices–Consumer Protection Act violations, breach of the implied warranty of suitability for commercial purposes, fraud, premises liability, res ipsa loquitur, and breach of contract.

claimer, or were alternatively precluded by the lease's waiver of subrogation clause. The parties settled the contract claim, and the trial court granted Snider a final summary judgment. In the court of appeals, Gym–N–I argued that the "as is" clause was no longer in effect after the original lease term ended in 1996, and that even if it was, the clause was unenforceable. 158 S.W.3d 78, 83–84.

The court of appeals affirmed the trial court's judgment. *Id.* at 81. We granted Gym–N–I's petition for review. 49 Tex. Sup.Ct. J. 509 (Apr. 21, 2006).

## III

### Issues Presented

Gym–N–I argues that: (1) the "as is" clause lapsed when the original lease term expired; (2) the clause does not waive claims for breach of the implied warranty of suitability, negligence per se, gross negligence, and fraud; (3) the absence of a sprinkler system constitutes a latent premises defect; and (4) the waiver of subrogation clause is not valid. We hold that the "as is" clause was in effect at the time of the fire, the implied warranty of suitability disclaimer expressly and effectively disclaimed that warranty, and the "as is" clause negated the causation element of Gym–N–I's other claims against Snider. Consequently, we do not reach Gym–N–I's remaining issues.

## IV

### Discussion

#### A

#### Enforceability of the "as is" clause

Gym–N–I argues that the "as is" provision did not survive when lease's original term expired. Gym–N–I contends that because it never exercised the lease's renewal options,[6] and the lease expired almost four years before the fire, the parties "shared a simple month-to-month, landlord-tenant relationship under the 'holding over' clause of the original lease" when the fire occurred. Citing *Bockelmann v. Marynick,* 788 S.W.2d 569 (Tex.1990), Gym–N–I argues that the holdover tenancy is a "new tenancy" to which the terms of the original lease do not apply.

■ Snider responds that, under the written lease, the "as is" clause, along with all other terms of the lease, governs during any holdover month-to-month tenancy. The court of appeals held that the "as is" clause survived the original lease term's expiration. 158 S.W.3d at 84. We agree.

Gym–N–I and Snider allowed the original lease agreement to expire without executing a new instrument. Because Gym–N–I continued to occupy the premises, it was a holdover tenant. The parties agree that their relationship was best characterized as a month-to-month tenancy as contemplated by the holdover clause in the lease. That clause provides that "[a]ny holding over without written consent of Landlord shall constitute a lease from month-to-month, *under the terms and provisions of this Lease* to the extent applicable to a tenancy from month-to-month." (Emphasis added.) Although Gym–N–I argues that the tenancy is not governed by the lease's terms, we cannot ignore the plain and ordinary meaning of the phrase "under the terms and provisions of this Lease." We hold that "under the terms and provisions of this Lease" means just

---

**6.** The lease provided two options for renewal, one in the original document and another in a signed amendment to the lease. The clauses granted Gym–N–I an "option to extend the term of this Lease" for two year terms upon ninety days notice prior to the expiration of the current term.

that: the lease governed the month-to-month tenancy. Thus, the "as is" clause was in effect when the fire occurred.

Furthermore, Gym–N–I's reliance on *Bockelmann* is misplaced. *See Bockelmann,* 788 S.W.2d 569. In that case, Brenda and Hermann Bockelmann, husband and wife, were cotenants in a residential lease. *Id.* at 570. Ten days before the lease expired, Brenda separated from Hermann and vacated the residence. *Id.* Hermann remained on the premises after the lease expired, triggering the lease's holdover provision, which provided that "[s]hould Tenant remain in possession of the demised premises . . . after the natural expiration of this lease, a new tenancy from year to year shall be created between Lessor and Tenant which shall be subject to all the terms and conditions hereof. . . ." *Id.* Subsequently, Hermann ceased paying rent and the landlord sued both Hermann and Brenda to recover the unpaid rent. *Id.*

■ The issue before us was whether Brenda was liable for the rent that accrued while Hermann was a holdover tenant. *Id.* at 570. Holding that Brenda was not liable, we said that "under the express terms of the lease, [Hermann's] holdover tenancy was a new tenancy rather than an extension or renewal of the original lease." *Id.* at 571–72. Thus, Hermann's holdover tenancy was not a continuation of the original cotenancy, but rather a new tenancy for which only Hermann was liable. *Id.* at 572. Our use of the term "new tenancy" came directly from the holdover provision of the lease. We did not say that the terms and provisions of the original lease would not apply. To the contrary, we gave effect to the lease stating that "this new tenancy would be subject to the same terms and conditions as the original tenancy." *Id.* at 571. The difference between the original and new tenancies involved the

parties who were bound, not the tenancy's terms and conditions. At least one court of appeals has recognized this important distinction. *Clark v. Whitehead,* 874 S.W.2d 282, 283–84 (Tex.App.-Houston [1st Dist.] 1994, writ denied) (rejecting holdover tenant's argument that *Bockelmann* supports a finding that guarantees contained in the original lease did not apply to the holdover tenancy). *Bockelmann* stands for the proposition that a cotenant who does not holdover is not liable for unpaid rent incurred when the other cotenant holds over; thus, it does not support Gym–N–I's argument that the original lease terms did not apply to the holdover tenancy.

Having concluded that the "as is" provision was still in effect when the fire occurred, we next address whether it waives some or all of Gym–N–I's claims.

**B**

**Effect of the implied warranty of suitability disclaimer**

Gym–N–I argues that the "as is" provision cannot nullify the implied warranty of suitability as to the defects at issue in this case. Gym–N–I contends that our *Davidow* opinion authorized a waiver of the implied warranty of suitability only when the lease makes the tenant responsible for certain specifically enumerated defects. *Davidow v. Inwood North Professional Group–Phase I,* 747 S.W.2d 373, 377 (Tex. 1988). Consequently, the general "as is" provision in this lease could not waive the warranty.

■ Snider answers that Gym–N–I's claim for breach of the implied warranty of suitability is waived because the lease's "as is" clause expressly disclaimed that warranty. *See Prudential Ins. Co. Of Am. v.*

*Jefferson Assocs., Ltd.,* 896 S.W.2d 156, 161 (Tex.1995). We agree with Snider.[7]

■ We first recognized the implied warranty of suitability for intended commercial purposes in *Davidow.* 747 S.W.2d at 377. The warranty means "that at the inception of the lease there are no latent defects in the facilities that are vital to the use of the premises for their intended commercial purpose and that these essential facilities will remain in a suitable condition." *Id.*

*Davidow* illustrates the purpose of the implied warranty of suitability. Dr. Davidow leased office space from Inwood for his medical practice and began experiencing problems soon after moving into the building. Davidow, 747 S.W.2d at 374. The problems were extensive: inadequate air conditioning, a leaky roof, pest and rodent infestations, inadequate lighting, periods of no electricity, a filthy parking lot, and repeated vandalization. *Id.* at 374–75. Davidow eventually vacated the premises and ceased paying rent before the lease expired. *Id.* at 375. Inwood sued Davidow for the unpaid rent. *Id.* Davidow raised the affirmative defenses of material breach of contract and breach of the implied warranty that the premises were suitable for use as a medical office. *Id.* We agreed with Davidow's argument that "commercial tenants generally rely on their landlords' greater abilities to inspect and repair the premises." *Id.* at 376. *Davidow* merely expanded the application of the implied warranty of habitability already recognized in residential leases in

*Kamarath v. Bennett,* 568 S.W.2d 658, 660–61 (Tex.1978).[8]

■ While *Davidow* did not address whether or how the implied warranty of suitability may be waived, we did say that if "the parties to a lease expressly agree that the tenant will repair certain defects, then the provisions of the lease will control." *Davidow,* 747 S.W.2d at 377. We also listed several factors to consider when determining a breach of the warranty, including:

> the nature of the defect; its effect on the tenant's use of the premises; the length of time the defect persisted; the age of the structure; the amount of the rent; the area in which the premises are located; *whether the tenant waived the defects;* and whether the defect resulted from any unusual or abnormal use by the tenant.

*Id.* (emphasis added). Thus, *Davidow* both recognized the implied warranty of suitability and noted that the agreement's terms could alter that warranty. We had no occasion to decide the manner in which the warranty could be waived.

Although we have not spoken again on the scope of the waiver, several courts of appeals—including the court of appeals in this case—have. *See Gym–N–I,* 158 S.W.3d at 87 ("[U]nder *Davidow,* the 'as is' clause negates the implied warranty of suitability itself."); *Lee v. Perez,* 120 S.W.3d 463, 468 (Tex.App.-Houston [ 14th Dist.] 2003, no pet.) (noting that an "as is" clause may waive implied warranties, but concluding that the clause in this case did not waive the deed restriction defect at

---

7. Because the "as is" clause at issue in this case expressly disclaimed the implied warranty of suitability, we do not address whether an "as is" clause lacking express disclaimer language would effectively waive the implied warranty of suitability.

8. After our *Kamarath* decision, the Legislature quickly passed a statute governing the implied warranty of habitability in residential rental property. *See* Act of May 28, 1979, 66th Leg., R.S., ch. 780, §§ 1–18, 1979 Tex. Gen. Laws 1978 (current version at Tex. Prop. Code §§ 92.001–.061).

issue because the scope of the "as is" waiver was limited to physical conditions on the property); *cf. Parts Indus. Corp. v. A.V.A. Servs., Inc.,* 104 S.W.3d 671, 680 (Tex.App.-Corpus Christi 2003, no pet.) ("As a matter of law, the landlord's implied warranty of suitability for commercial purposes is limited only by those specific terms in a commercial lease whereby a tenant expressly agrees to repair certain defects."); *Gober v. Wright,* 838 S.W.2d 794, 798 (Tex.App.-Houston [1st Dist.] 1992, writ denied) (same). The *Parts Industries* and *Gober* courts agreed that the implied warranty of suitability can only be waived as to specific conditions where the "tenant expressly agrees to repair certain defects." *Parts Indus.,* 104 S.W.3d at 680; *Gober,* 838 S.W.2d at 798. Neither of these cases, however, involved an express disclaimer of the implied warranty of suitability like the lease at issue here. Moreover, the leases in *Parts Industries* and *Gober* expressly made the lessor responsible for the defects at issue. *Parts Indus.,* 104 S.W.3d at 675 (finding that the lessor agreed to keep the roof—the defect at issue—"in good repair"); *Gober,* 838 S.W.2d at 796 (finding that under the lease, the lessors were responsible for repair of the roof—the defect at issue). Therefore, *Gym–N–I* is distinguishable from *Parts Industries* and *Gober* because the lease expressly disclaims the implied warranty of suitability. Here, the court of appeals determined that under *Prudential,* the "as is" clause would foreclose the implied warranty of suitability claim.[9] 158 S.W.3d at 87. We agree.

In *Prudential,* we were asked to determine the effect of an "as is" clause on a buyer's claim for damages against the seller based on the condition of the commercial property. 896 S.W.2d at 158–59. In that case, Goldman bought an office building from Prudential Insurance Company. *Id.* at 159. The contract's "as is" clause provided:

> Seller and Purchaser agree that Purchaser is taking the Property "AS IS" with any and all latent and patent defects and that there is no warranty by Seller that the Property is fit for a particular purpose. Purchaser acknowledges that it is not relying upon any representation, statement or other assertion with respect to the Property condition, but is relying upon its examination of the Property. Purchaser takes the Property under the express understanding there are no express or implied warranties (except for limited warranties of title set forth in the closing documents).

*Id.* at 160. Goldman, a knowledgeable real estate investor, had the property inspected by his maintenance supervisor, his property manager, and an independent professional engineering firm; none of the inspectors discovered the asbestos that would later become the basis of the lawsuit. *Id.* at 159. In addition, there was no evidence that Prudential knew—before the parties completed the sale—that the building contained asbestos. *Id.* at 159–60. Goldman later discovered that the building contained asbestos fireproofing when he tried to refinance the building. *Id.* at 160. He sued Prudential, alleging violations of the Texas Deceptive Trade Practices— Consumer Protection Act, negligence,

---

**9.** *Lee* also supports this reading of *Prudential. Lee v. Perez,* 120 S.W.3d 463. In that case, the landlord argued that the lease's "as is" clause waived the implied warranty of suitability. *Id.* at 467–68. The court of appeals noted that an "as is" clause "may indeed waive express or implied warranties." *Id.* at 468 (citing *Prudential*). It concluded, though, that the deed restriction defect at issue was not waived by the clause in that case because its waiver was limited to physical conditions on the property. *Id.*

fraud, and breach of the duty of good faith and fair dealing. *Id.* at 160. We held that the "as is" provision negated the causation element necessary for Goldman to recover on each asserted cause of action. *Id.* at 161.

> The sole cause of a buyer's injury [when he agrees to purchase something "as is"], by his own admission, is the buyer himself. He has agreed to take the full risk of determining the value of the purchase. He is not obliged to do so; he could insist instead that the seller assume part or all of that risk by obtaining warranties to the desired effect. If the seller is willing to give such assurances, however, he will ordinarily insist upon additional compensation. Rather than pay more, a buyer may choose to rely entirely upon his own determination of the condition and value of his purchase. In making this choice, he removes the possibility that the seller's conduct will cause him damage.

*Id.* Thus, by agreeing to purchase the property "as is," Goldman agreed to rely on his own appraisal of the bargain, and he accepted the risk that he may err. *Id.* We did not address what effect, if any, an "as is" provision would have on a claim for breach of the implied warranty of suitability, as this warranty applies only to commercial leases and Prudential involved a sale of commercial property. Today, we squarely address whether an express disclaimer may waive the implied warranty of suitability in a commercial lease. Davidow noted that the provisions of the lease would control if the parties expressly agreed that the tenant would repair certain defects. 747 S.W.2d at 377. Pruden-

tial stands for the proposition that—absent fraud in the inducement—an "as is" provision can waive claims based on a condition of the property. 896 S.W.2d at 161. Taken together, these cases lead to one logical conclusion: the implied warranty of suitability is waived when, as here, the lease expressly disclaims that warranty. We hold, therefore, that as a matter of law, Gym–N–I waived the implied warranty of suitability.[10]

■ Our conclusion that the implied warranty of suitability may be contractually waived is also supported by public policy. Texas strongly favors parties' freedom of contract. *BMG Direct Mktg., Inc. v. Peake,* 178 S.W.3d 763, 767 (Tex.2005); *In re Prudential Ins. Co. of Am.,* 148 S.W.3d 124, 129 (Tex.2004) ("As a rule, parties have the right to contract as they see fit as long as their agreement does not violate the law or public policy."). We recently reaffirmed this policy, stating that:

> [P]ublic policy requires . . . that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts when entered into freely and voluntarily shall be held sacred and shall be enforced by Courts of justice. Therefore, you have this paramount public policy to consider—that you are not lightly to interfere with this freedom of contract.

*BMG Direct,* 178 S.W.3d at 767 (quoting *Wood Motor Co. v. Nebel,* 150 Tex. 86, 238 S.W.2d 181, 185 (1951)). Freedom of contract allows parties to bargain for mutually agreeable terms and allocate risks as they see fit. A lessee may wish to make her own determination of the commercial suit-

---

10. Normally, under *Prudential,* a court must first determine whether the "as is" clause is enforceable. 896 S.W.2d at 162 (listing factors to be considered in determining whether the "as is" clause is enforceable). We do not address this preliminary question, however, because the court of appeals found that the "as is" clause was enforceable, and neither party has challenged that finding. 158 S.W.3d at 84–85.

ability of premises for her intended purposes. By assuming the risk that the premises may be unsuitable, she may negotiate a lower lease price that reflects that risk allocation. Alternatively, the lessee is free to rely on the lessor's assurances and negotiate a contract that leaves the implied warranty of suitability intact.

We recognize that our holding today stands in contrast to the implied warranty of habitability, which "can be waived only to the extent that defects are adequately disclosed." *Centex Homes v. Buecher*, 95 S.W.3d 266, 274 (Tex.2002).[11] The implied warranty of habitability "applies in almost all jurisdictions only to residential tenancies" while commercial tenancies are "excluded primarily on the rationale that the feature of unequal bargaining power justifying the imposition of the warranty in residential leases is not present in commercial transactions." 2 Richard R. Powell, Powell on Real Property § 233[2][b] (Patrick J. Rohan, ed.,1991).[12] While most states recognize the implied warranty of habitability, four of the six state high courts to consider the implied warranty of suitability in commercial leases have declined to adopt it.[13] The fact that the lessor impliedly warrants suitability in

11. After we decided *Centex Homes*, the Legislature created the Texas Residential Construction Commission and gave it rulemaking authority to create statutory warranties of workmanship and habitability as to new residential construction. *See* Tex. Prop.Code § 408.001(2). These statutory warranties are exclusive and supercede all previous implied warranties of workmanship and habitability. *Id.* § 430.006. The Commission created a statutory warranty of habitability obligating a builder to construct a home that is "safe, sanitary and fit for humans to inhabit" and prohibited parties from contractually waiving or modifying the warranty. 10 Tex. Admin. Code § 304.3(f), (i) (2005) (Tex. Residential Constr. Comm'n, Limited Warranties).

12. *See also* Restatement (Second) of Property, Landlord & Tenant § 5.1 cmt. b (1977) (endorsing the implied warranty of habitability in residential leases but taking no position as to whether it should be extended to commercial leases, noting that such leases "are usually made under circumstances of greater equality of bargaining power than in the case of residential properties and the considerations that affect decisions often differ in the two situations so far as the condition of the premises on the date the lease is made is concerned"); Paula C. Murray, *The Evolution of Implied Warranties in Commercial Real Estate Leases*, 28 U. Rich. L. Rev. 145, 160–62 (1994) ("Courts that have eagerly embraced the notion of implied covenants in residential leases have not been very willing to do so in the commercial context."); Anthony J. Vlatas, *An Economic Analysis of Implied Warranties of Fitness in Commercial Leases*, 94 Colum.

L.Rev. 658, 667–69 (1994) ("[M]any legislatures and courts have implied a warranty of 'habitability' into leases of real property for residential purposes.... [A]uthorities have divided over whether the law should now also imply a warranty of commercial-leasehold fitness.").

13. *See Serv. Oil Co. v. White*, 218 Kan. 87, 542 P.2d 652, 659–60 (1975) (refusing to recognize implied warranty of suitability because a "lessee [of commercial property] does not generally occupy an inferior bargaining position" and "[t]he higher standards of personal facilities vital to public health and welfare required for residential property are not generally required for business or commercial property"); *Gehrke v. Gen. Theatre Corp.*, 207 Neb. 301, 298 N.W.2d 773, 775 (1980) ("In the absence of an express agreement to the contrary, a lessor does not warrant the fitness or safety of the premises and the lessee takes them as he finds them."); *Golub v. Colby*, 120 N.H. 535, 419 A.2d 397, 398 (1980) ("[W]e decline to extend, to commercial leases, the implied warranty of habitability found to exist in residential leases."); *B.W.S. Invs. v. Mid–Am Rests., Inc.*, 459 N.W.2d 759, 763 (N.D. 1990) ("While North Dakota statutory law requires a landlord of a *residential* dwelling unit to 'make all repairs and do whatever is necessary to put and keep the premises in a fit and habitable condition,' there is no statutory authority or case law authority in North Dakota that supports [the tenant's] argument for an implied warranty of habitability or fitness for a lease on commercial property.") (internal citations omitted). *Contra Reste Realty*

Texas ensures that, when the warranty is waived, the parties focus their attention on who is responsible for discovering and repairing latent defects, and they may allocate the risk accordingly. We see no compelling reason to disturb that market transaction here.

## C

### Gym–N–I's other claims against Snider

■ The trial court granted summary judgment for Snider on Gym–N–I's other claims, including negligence per se, gross negligence, violations of the Deceptive Trade Practices–Consumer Protection Act, and fraud. Gym–N–I argues that record evidence supports each claim. The court of appeals held that, as a matter of law, the "as is" clause negated the causation element essential to each of these causes of action. 158 S.W.3d at 86 (citing *Prudential*, 896 S.W.2d at 161). We agree.

■ By agreeing to lease property "as is," a lessee agrees to make his own appraisal of the bargain and accepts the risk that he may misjudge its value. *Prudential*, 896 S.W.2d at 161. The lessor gives no assurances, express or implied, concerning the value or condition of the premises. *Id.* Thus, an "as is" agreement precludes the lessee from proving that the lessor's conduct caused harm. *Id.*

Gym–N–I expressly agreed to "accept[ ] the Premises 'as is.'" Gym–N–I further agreed that Snider "has not made and does not make any representations as to the commercial suitability, physical condition, layout, footage, expenses, operation or any other matter affecting or relating to the premises." Therefore, Gym–N–I con-

tractually disavowed any reliance upon any representation by Snider. *Prudential*, 896 S.W.2d at 161. By agreeing to lease the building "as is," Gym–N–I agreed to make its own appraisal of the physical condition of the premises. *Id.* Thus, the sole cause of Gym–N–I's injury, by its own admission, is itself. *Id.* We hold, therefore, that the "as is" clause negates Gym–N–I's claim that Snider's actions caused injury.[14]

Because we hold that all of Gym–N–I's claims are foreclosed by the "as is" clause and express disclaimer of the implied warranty of suitability, we do not reach Gym–N–I's other issues.

## V

### Conclusion

For the reasons stated, we affirm the court of appeals' judgment. TEX. R. APP. P. 60.2(a).

---

*Corp. v. Cooper*, 53 N.J. 444, 251 A.2d 268, 273 (1969); *Davidow*, 747 S.W.2d 373.

**14.** In *Prudential*, we noted than an "as is" agreement procured by fraudulent inducement would not negate the causation element

of a fraud-in-the-inducement claim. 896 S.W.2d at 161. We need not consider that exception in this case because Gym–N–I has not asserted that claim.