**Opinion issued April 7, 2016**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-14-00707-CV

———————————

### MARINECORP INTERNATIONAL, LTD., Appellant

### V.

### THE CHOPPER GROUP, LLC AND OUTLAW COUNTRY, LLC, Appellees

---

**On Appeal from the 80th District Court**
**Harris County, Texas**
**Trial Court Case No. 2012-23983**

---

### MEMORANDUM OPINION

This case involves a landlord-tenant dispute over commercial leases. The

tenants sued, alleging both breach of contract and violations of the Texas

Deceptive Trade Practices Act[1] arising out of the landlord's breach of the implied warranty of suitability, among other alleged DTPA violations. The jury found in the tenants' favor on both breach of contract and DTPA, but the judgment against the landlord is based only upon the DTPA claims. The landlord appeals, challenging the jury's findings regarding both breach of contract and the DTPA claims. We affirm.

## BACKGROUND

**The Parties**

Tony Miller is the sole owner of two companies, The Chopper Group, L.L.C. ["Chopper"], a bar, and Backwoods Country Club, L.L.C. d/b/a Outlaw Country ["Outlaw"], a country/western venue. Both businesses are located in a strip mall located on Kuykendahl Road and I-45 in Harris County. Marinecorp International, Ltd. ["Marinecorp"] owns the strip mall and is the landlord for both Chopper and Outlaw. Marinecorp is owned by the Nasser family, and Ayaz Nasser is its president. Michael "Mike" Mirza is employed by Zenith Real Estate, a company related to Marinecorp, which serves as the property manager for Marinecorp's strip mall. Ed Wolochin is also a Senior Property Manager for Marinecorp.

---

[1] *See* TEX. BUS. & COM. CODE ANN. §§ 17.41–63 (West 2011 & Supp. 2015) (hereafter, "DTPA").

2

**The Chopper Lease**

In Spring 2010, Miller and his investor, Kyle Tones, began looking for a place to open Chopper Sports Bar and Grill. Grady "Bud" Tibbs, a commercial real estate broker, showed Miller a space in Marinecorp's strip mall that had been a Marco's Mexican Restaurant, but had sat vacant for two years. The space was still set up as a restaurant, and there was even still food in the kitchen.

Chopper decided to lease the space, which was 5,400 square feet in size. The lease was signed on April 20, 2010, and Miller began cleaning up and renovating the space. The lease provided that Marinecorp was responsible for common areas, including the parking lot. The lease also provided that Chopper "accepted the Demised Premises in its "AS-IS condition[,]" except for requiring a working air conditioning unit.

Marinecorp fixed Chopper's leaking roof, and Chopper repaired the electricity and air conditioning. After completing the build-out for the bar, Chopper opened for business in mid-July 2010. However, it soon became apparent that the parking lot lights, for which Marinecorp was responsible under the lease, did not function. Chopper complained that its "scary" parking lot deterred customers, and it asked Marinecorp to repair the parking lot lights, which Marinecorp promised to do.

Marinecorp's maintenance man, Louis, tried to fix the parking lot lights, but was unable to do so because there was an issue with the underground wiring and he was not an electrician. Mark Mirza, the property manager, acknowledged that it took over 5 to 6 weeks to figure out what was wrong with the lights and how to repair them. He also acknowledged that there was not even a functioning meter for the lights until mid-September. At some point in mid-September, rather than having an electrician fix the wiring and lights, Marinecorp placed temporary generators and lights in the Chopper parking lot. These lights, however, were not as bright as normal parking lot lights, and Chopper had to refill the generators with diesel at its own expense. Despite repeated assurances from Marinecorp that the parking lot lights would be fixed, records show that Chopper continued to complain about non-functioning parking lot lights as late as February 2011.

**The Outlaw Lease**

Next to Chopper in the strip mall was a much larger 10,998 square foot space had been a Walgreens drug store, but had been vacant for several years. Shortly after Chopper opened in the summer of 2010, Mirza asked Miller about whether he would be interested in renting and renovating that space too. Miller was interested in opening a country/western dance hall venue that would operate primarily on weekends. Miller testified that he never would have considered

opening a second business in Marinecorp's strip mall if he had not relied on Marinecorp's promises regarding repairing Chopper's parking lot lights.

Again, working with real estate agent Bud Tibbs, Miller negotiated a lease with Marinecorp for the larger space. The lease also contained an "AS-IS" clause, except that Marinecorp promised to repair the roof, provide air conditioning units equal to 60 tons, and provide electrical services equal to 1000 amps. Marinecorp also agreed to advance $166,000 toward the renovations, which Outlaw was to repay through increased rent payments.

The Outlaw lease was signed on September 28, 2010, with a November 1, 2010 commencement date. Even before the lease was signed, Miller began renovations with a crew of approximately 30 to 40 people working to have the space completed by November 1. Because Marinecorp had not yet repaired the power, Outlaw had either to use generators to complete the rehab or to run extensions over to Chopper to supply power. Nevertheless, the rehab was completed by November 1.

There were, however, continuing problems with the roof at Outlaw. Every time it rained, "[Outlaw] was a mess." After complaining to Marinecorp, Miller was told that Marinecorp had hired a roof repairman name "Oscar." When Miller contacted Oscar, he learned that Oscar had been paid only $600, and that he had refused to come back and perform any further repairs to the 10,000 square foot

5

space without receiving additional pay. At the end of December, after a particularly hard rain, the leaking roof partially gave way, revealing that the roof repairs had been made with a piece of conveyor belt, not standard roofing materials. The roof was not subsequently repaired.

Miller applied for electrical service, and Centerpoint Energy came out to hook it up; Centerpoint was unable to do so, however, because of the wiring. Centerpoint came out to inspect several times, but would not approve the work by Marinecorp's electrician, Jim Hofelich. Hofelich corroborated at trial that it took months to complete the job because he ordered the wrong parts several times. Centerpoint did not hook up the electricity until January 2011.

Outlaw had similar problems with the air conditioning. Miller himself had one air conditioning unit set up by mid-October so that his office space at Outlaw would be habitable. Marinecorp hired Thon Dang to install four AC units on the Outlaw roof. Thon Dang's contract with Marinecorp specifically provided that he would not hook up the units to high voltage electricity. When he was finished with his work, Thon Dang tested the units by hooking them up to the parking lot meter because Outlaw still did not have electricity. As per his contract, he never hooked up the units, and he testified that he saw Marinecorp's maintenance man, Louis, doing so with another man he believed to be an electrician.

6

In February 2011, Miller organized a grand opening[2] at Outlaw. For approximately $25,000, Miller booked singer Tracy Lawrence and some other bands. Although 800 people showed up to see Tracy Lawrence, approximately half of them left because the venue was unbearably hot.

Miller complained to Marinecorp that the AC was not working, but when no repairs were made within a few days, Miller hired his own AC company to diagnose the problem. Durke Turner reported to Miller that three of the four AC units on the roof had never been connected to any electrical source.

**The Lockout, Lawsuit, and Jury Verdict**

After a dispute arose over Outlaw's failure to timely pay rent, Marinecorp locked both Chopper and Outlaw out of their respective premises. Soon after, Chopper and Outlaw filed suit against Marinecorp, alleging breach of contract, fraud, and violations of the DTPA. Marinecorp counterclaimed, alleging breach of contract."[3] After a jury trial, the jury found that both Marinecorp and Outlaw breached their agreement, but that Marinecorp breached first. The jury also found that Marinecorp "engage[d] in [a] false, misleading, or deceptive act or practice

---

[2] Two prior planned grand openings—one at Thanksgiving and one at New Years— had been canceled because of the lack of power.

[3] Marinecorp also filed claims against Miller and several others as guarantors of Chopper's and Outlaws's debts. These claims are not a part of this appeal.

that The Chopper Group or Outlaw Country relied on to its detriment that was a producing cause of damages[.]"

**The Judgment**

In its Modified Final Judgment, the trial court awarded Chopper $210,000 and Outlaw $290,000 in actual damages.[4] The judgment also awarded Chopper and Outlaw $11,000 each for "the knowing violation found by the jury under the Deceptive Trade Practices Act[.]" As acknowledged by Marinecorp in its brief, "[t]hese damges were awarded by the court under the DTPA theory of recovery alleged by Appellees." Finally, the Modified Final Judgment awarded Chopper and Outlaw their attorneys' fees, contingent attorneys' fees in the event of an appeal, prejudgment interest, and costs.

This appeal by Marinecorp followed.

## DTPA CLAIMS

In question 13, the jury was asked the following broad-form question regarding Chopper's and Outlaw's DTPA claims:

> Did MarineCorp International engage in any false, misleading, or deceptive act or practice that The Chopper Group or Outlaw County relied on to its detriment that was a producing cause of damages?

---

[4]  The original Final Judgment had awarded Chopper $223,000 and Outlaw $370,000, respectively. The Modified Final Judgment reduced these amounts by omitting the "loss of benefit of the bargain" damages found by the jury in the DTPA damages question.

8

"Producing cause" means a cause that was a substantial factor in bringing about the damages, if any, without which the damages would not have occurred. There may be more than one producing cause.

"False, misleading, or deceptive act or practice" means any of the following:

- Representing that goods or services had or would have sponsorship, characteristics, uses or benefits that they did not have, or

- Representing that goods or services are or will be of a particular standard, quality or grade if they were of another, or

- Advertising services with intent not to sell them as advertised, or

- Breach of implied warranty,

- Failing to disclose information about goods or services that was known at the time of the transaction with the intention to induce The Chopper Group into a transaction it otherwise would not have entered into if the information had been disclosed.

In question 14, the jury was asked whether Marinecorp's failure to comply with a warranty was a producing cause of damages to Chopper or Outlaw. And in question 15, the jury was asked whether Marinecorp "engage[d] in any unconscionable action or course of action that was a producing cause of damages to Chopper or Outlaw." The jury answered each of these questions in Chopper's and Outlaw's favor. In issues six through 8, Marinecorp challenges these findings on appeal.

9

**Breach of Contract only or DTPA?**

Relying on *Crawford v. Ace Sign, Inc.*, 917 S.W.2d 12, 14–15 (Tex. 1996), Marinecorp contends in issue 6 that the trial court erred in entering judgment on Chopper's and Outlaw's DTPA claims because "Chopper and Outlaw's claims constitute a breach of contract action and not a DTPA violation."

In *Crawford*, the Texas Supreme Court held that when a party alleges merely a breach of contract claim, without more, the breach of contract allegation does not constitute an actionable misrepresentation in violation of the DTPA. 917 S.W.2d at 14. The plaintiff in *Crawford* contracted for services in the form of an advertisement in a directory. 917 S.W.2d at 13. The plaintiff alleged that the sales agent represented to him that the success of his business was heavily dependent upon the advertising, and that the advertisement would increase his business by at least seventy to eighty percent in the first year. *Id.* The sales agent also told the plaintiff that if he paid the full price upfront, his advertisement would appear in a particular edition. *Id.* Based on these representations, the plaintiff agreed to renew a written contract for advertising. *Id.* Subsequently, the defendant failed to print the advertisement as promised. *Id.* The plaintiff argued that the defendant not only failed to publish the advertising as required by the contract, but also made certain misrepresentations during the meeting at which the plaintiff had agreed to renew his contract. *Id.* at 14. Notwithstanding these allegations, the court rejected the

10

plaintiff's argument that the case was actionable under the DTPA. *Id.* The court concluded that the defendant's statements, including the alleged misrepresentations, "were nothing more than representations that the defendants would fulfill their contractual duty to publish, and the breach of that duty sounds only in contract." *Id.* The court explained that "[t]he *statements* themselves did not cause any harm. The failure to run the advertisement (the breach of the contract) actually caused the lost profits, and that injury is governed by contract law, not the DTPA." *Id.* at 14–15 (emphasis in original).

While we agree that when the representations giving rise to a DTPA claim are the same as the contractual promises breached, a DTPA claim based on the same misrepresentation will not lie. However, we do not agree that is what happened here.

Although the DTPA question did permit the jury to find misrepresentations giving rise to DTPA violations, it also permitted the jury to find a DTPA violation for the breach of an implied warranty. A breach of warranty may form the basis for DTPA liability. *See Chilton Ins. Co. v. Pate & Pate Enters., Inc.*, 930 S.W.2d 877, 890 (Tex. App.—San Antonio 1996, writ denied). An implied warranty of suitability is implied in every commercial lease. *See Davidow v. Inwood N. Prof'l Group–Phase I*, 747 S.W.2d 373, 377 (Tex. 1988). The supreme court held that, unless the warranty is waived, a landlord in a commercial lease impliedly warrants

11

that facilities vital to the use of the premises for their intended commercial purpose are free from latent defects and will remain in suitable condition. *Id.*

Thus, it is the ***independent duty*** of a commercial landlord to provide a premises suitable for its intended purpose that gives rise to Chopper's and Outlaw's DTPA claims, not merely the promise to perform the contract. *See Dallas Fire Ins. Co. v. Tex. Contractors Sur. & Cas. Agency*, 128 S.W.3d 279, 294 (Tex. App.—Dallas 2004), *rev'd on other grounds*, 159 S.W.3d 895 (Tex. 2005) (holding *Crawford* not applicable when DTPA claims were not based on lessor's "failure to perform duties imposed by the contract but on the independent duty imposed by law not to make knowing misrepresentations inducing a party into a contract"); *see also Howell Crude Oil Co. v. Donna Refinery Partners, Ltd.*, 928 S.W.2d 100, 108–09 (Tex. App.—Houston [14th Dist.] 1996, writ denied) (distinguishing *Crawford* when defendant made affirmative misrepresentation during contract formation in violation of DTPA and independent of contract). As such, *Crawford* does not apply to the extent that Chopper and Outlaw have pleaded and proved a breach of warranty of suitability, which is a duty independent of any contractual duties owed by Marinecorp.

**Breach of Implied Warranty of Suitability**

A landlord may be liable for breach of the implied warranty of suitability for intended commercial purposes if the evidence shows that: (1) the landlord leased

property to the tenant, (2) the lease covered commercial property, (3) the leased property had a latent physical or structural defect at the inception of the lease, (4) the defect was in an area that was vital to the property for its intended commercial purpose, (5) the defect made the property unsuitable for its intended commercial purpose, and (6) the tenant suffered injury as a result. *7979 Airport Garage, L.L.C. v. Dollar Rent A Car Sys., Inc.*, 245 S.W.3d 488, 502 (Tex. App.—Houston [14th Dist.] 2007, pets. denied) (citing *Davidow*, 747 S.W.2d at 377); *see McGraw v. Brown Realty Co.*, 195 S.W.3d 271, 276 (Tex. App.—Dallas 2006, no pet.).

In its brief, Marinecorp does not challenge the evidence as it relates to any of the elements listed above, except (6).  In issue 8(d) it contends that

> There was no evidence or insufficient evidence[5] to establish that Marinecorp breach an implied warranty, as the lease provisions stated the tenants accepted the property in its "as is" condition.

Essentially, Marinecorp argues that, by agreeing to an "as-is" clause, Chopper and Outlaw waived the implied warranty of suitability, and that, "[i]f in fact they were damaged because of the conditions of the subject premises, causation lies directly on them and not on Marinecorp."

In *Gym-N-I Playgrounds, Inc. v. Snider*, 220 S.W.3d 905, 914 (Tex. 2007), the supreme court considered whether an "as-is" clause in a commercial lease

---

[5]     Although phrased as a sufficiency of the evidence issue, Marinecorp is claiming that, because of the as-is clauses, its actions, as a matter of law, could not be the cause of Chopper's and Outlaw's damages.

13

defeated the causation element of an implied warranty of suitability cause of action, concluding that in that case, it did. The "as-is" clause in that case provided in pertinent part: "LANDLORD MAKES NO OTHER WARRANTIES, EXPRESS OR IMPLIED, OF MERCHANTABILITY, MARKETABILITY, FITNESS OR SUITABILY FOR A PARTICULAR PURPOSE OR OTHERWAISE, EXCEPT AS SET FORTH HEREIN. ANY IMPLIED WARRANTIES ARE EXPRESSLY DISCLAIMED AND EXCLUDED." *Id.* at 907 fn.1. The court concluded that, by agreeing to this language, the lessee contractually waived the warranty of suitability, stating:

> Freedom of contract allows parties to bargain for mutually agreeable terms and allocate risks as they see fit. A lessee may wish to make her own determination of the commercial suitability of premises for her intended purposes. By assuming the risk that the premises may be unsuitable, she may negotiate a lower lease price that reflects that risk allocation. Alternatively, the lessee is free to rely on the lessor's assurances and negotiate a contract that leaves the implied warranty of suitability intact.

*Id.* at 912–13. In so holding, the court distinguished two cases—*Parts Indus. Corp v. A.V.A. Servs, Inc.* 104 S.W.3d 671, 680 (Tex. App.—Corpus Christi 2003, no pet.) and *Gober v. Wright*, 838 S.W.2d 794, 798 (Tex. App.—Houston [1st Dist.] 1992, writ denied)—both of which had held that the implied warranty of suitability could only be waived as to specific conditions that the tenant had expressly agreed to repair. In distinguishing the two cases, the *Snider* court stated:

14

> Neither of these cases, however, involved an express disclaimer of the implied warranty of suitability like the lease at issue here. Moreover, the leases in *Parts Industries* and *Gober* expressly made the lessor responsible for the defects at issue. *Parts Indus.*, 104 S.W.3d at 675 (finding that the lessor agreed to keep the roof—the defect at issue— "in good repair"); *Gober*, 838 S.W.2d at 796 (finding that under the lease, the lessors were responsible for repair of the roof—the defect at issue).

*Id.* at 911. With these principles in mind, we examine the leases and facts in this case.

The defect alleged in the Chopper lease was the non-functioning parking lot lights, a portion of the common area controlled by Marinecorp, not Chopper. The as-is clause in the lease provided:

> If this Lease is for a portion of the Shopping Center already contracted, Tenant acknowledges that it has, prior to the execution hereof, Inspected the Demised Premises, that Landlord's work is completed (except as may be otherwise expressly provided in Exhibit C attached hereto), and that Tenant has accepted the Demised Premises in its "AS-IS" condition, it being agreed that Landlord shall have no liability or responsibility for the defects in the Demise Premises, including latent defects. By occupying the Demised Premises, Tenant shall be deemed to have accepted the same and to have acknowledged that the same fully comply with Landlord's obligations and covenants hereunder, as shown on Exhibit C.

Exhibit C does not mention parking lot lights.

While this "as-is" clause, like the clause in *Snider*, expressly waives liability for "latent defects," i.e., the warranty of suitability, such waiver is insufficient in the Chopper contract for two reasons. First, like the *Parts Industries* and *Gober* cases distinguished by the *Snider* court, the Chopper contract, in section 5.1, makes

Marinecorp responsible for the common areas of the property. Second, the "AS-IS" clause applies to "the Demised Premises," an area defined in the contract as "approximately 5,400 square feet." In a very similar case, the Fourteenth Court of Appeals held that an "as-is" clause referring to the "Demised Premises" applied only "to the actual retail space leased by [the lessee] and not the whole shopping center property." *El Sabor de Mi Terra, Inc. v. Atascocita/Boone JV*, No. 14-06-00652, 2007 WL 2417921, at *12 (Tex. App.—Houston [14th Dist] Aug. 28, 2007, pet. denied) (mem. op.). As such, the court "conclude[ed] that the 'as is' provisions waiv[ed] only those claims against appellees that were based on problems in the "Demised Premises," and that claims originating outside the "Demised Premises" were not defeated by the as-is clause. Thus, because the contract makes Marinecorp responsible for the common area, and because the "Demised Premises" does not include the common area, the as-is clause in the Chopper lease does not waive its warranty of suitability.

The defects alleged in the Outlaw lease concerned the leaking roof and the absence of electricity and air conditioning. The as-is clause in the Outlaw lease is similar, but slightly different, from that in the Chopper lease. It provides:

> If this Lease is for a portion of the Shopping Center already constructed, Tenant acknowledges that it has, prior to the execution hereof, inspected the Demised premises, that Landlord's work is completed (except as may be otherwise expressly provided in Exhibit C attached hereto), and that Tenant has accepted the Demised Premises in its "AS-IS" condition, it being agreed that Landlord shall

16

have no liability or responsibility for defects in the Demised Premises, including latent defects. By occupying the Demised Premises, Tenant shall be deemed to have accepted the same and to have acknowledged that the same fully comply with Landlord's obligations and covenants hereunder, as shown on Exhibit C. Except for roof repair and Hvac units replaced with an amount equal to 60 tons. Electrical service brought into the space equal[s] 1000 amps.

Exhibit C provides that the lease is "AS-IS" Except as follows: Landlord will provide a new air-conditioning unit with a 90 day warranty. In addition, Landlord will make all necessary repairs to the roof." Based its plain language, that as-is clause in the Outlaw lease does not apply to Outlaw's claims involving the roof or air conditioning and power. And, like the cases distinguished in *Snider*, Marinecorp is responsible for the defects complained of.

Because Outlaw and Chopper did not waive their claims for breach of implied warranty, we overrule Marinecorp's issues 6 and 8(d).

**"Knowing" Violation of the DTPA**

In response to question 17, the jury found that Marinecorp "knowingly" violated the DTPA, as defined in the charge:

"Knowingly" means actual awareness, at the time of the conduct, of the falsity, deception, or unfairness of the conduct in question or actual awareness of the conduct constituting a failure to comply with a warranty. Actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness.

In a portion of issue 8c, Marinecorp contends that there is "no evidence or insufficient evidence to establish that Marinecorp's alleged representations

17

constituted an engagement in DTPA-prohibited conduct "knowingly," because "[t]he evidence presented at trial established the Marinecorp's property manager represented to Appellees that the electricity would be connected the first week of November," and "[w]hen this representation was made, he had no idea that the electricity would not be connected at a later date."

Marinecorp's argument on this issue assumes that a misrepresentation about the electricity is the DTPA violation upon which the "knowingly" finding is based. It does not, however, address whether there was "actual awareness of the conduct constituting a failure to comply with a warranty." Insomuch as we have upheld a breach of warranty finding, Marinecorp's failure to address the "knowingly" finding in light of the warranty violation waives this issue on appeal.

Accordingly, we overrule the portion of issue 8c that relates to the jury's finding that Marinecorp knowingly violated the DTPA.

**Other DTPA Issues**

In issue 7, Marinecorp contends that wrongful eviction will not support a finding of a DTPA violation. In issue 8a, an issue related to fraudulent inducement, Marinecorp, contends there is no evidence that it did not intend to fulfill any of the promises that it made. In issue 8b, another issue related to fraudulent inducement, Marinecorp contends there is no evidence that any of its alleged misrepresentations caused damage to Chopper and Outlaw. In issue 8c,

Marinecorp contends there was insufficient evidence that Marinecorp's actions were unconscionable. Because we have already upheld one of the DTPA violations, we need not address the other grounds upon which a DTPA violation might have been based. *See Parkway Co. v. Woodruff*, 901 S.W.2d 434, 440 (Tex. 1995) (noting appellate court did not address unconscionability finding when trial court's DTPA judgment was upheld on another theory); *see also Gillman Imports of San Antonio, Inc. v. Castillo*, No. 04–95–00670–CV, 1996 WL 383112, at *5 (Tex. App.—San Antonio July 10, 1996, no pet.) (citing *Parkway* and declining to address jury's unconscionability finding because judgment could be upheld based on other DTPA violations).

Accordingly, we need not address issues 7 and 8a, 8b, and 8c, and we decline to do so.

## BREACH OF CONTRACT CLAIMS

In issues 1 through 5, Marinecorp complains about the breach of contract jury findings as follows:

> Chopper and Outlaw's claims of a breach of contract fail because they did not meet the conditions precedent of giving written notice of the alleged defaults and allowing Marinecorp thirty days to cure each such default as required by the subject leases.

> Chopper and Outlaw deprived themselves of any excuse for ceasing performance on their part because they elected to treat the leases as continuing.

19

The trial court should have rendered judgment against Chopper and Outlaw for damages for past and future lease payments, as ample evidence existed of Marinecorp's mitigation of damages.

Outlaw should not have been awarded damages as a result of not being able to open its dance hall for business as a result of Marinecorp's actions because the overwhelming evidence attributes causation of damages to Outlaw preventing it from opening earlier to its own actions or inactions.

The trial court committed harmful error by not submitting to the jury an instruction and question regarding mitigation of damages as it relates to Outlaw.

As is made clear in Marinecorp's Motion to Disregard Jury Findings, these issues challenge the breach of contract jury findings, i.e., jury findings 1, 3, 5, 6, 8, and 9. However, the judgment is based on the DTPA findings, not the breach of contract findings. Error, if any, relating to these breach of contract findings did not result in an adverse judgment against Marinecorp and is, therefore, harmless. *See GuideOne Lloyds Ins. Co. v. First Baptist Church of Bedford*, 268 S.W.3d 822, 839 (Tex. App.—Fort Worth 2008, no pet.) (holding error, if any, in challenged jury questions was harmless "because the trial court did not enter judgment based on the jury's findings to those questions."); *see also See Tracy v. Annie's Attic, Inc.*, 840 S.W.2d 527, 538 (Tex. App.—Tyler 1992, writ denied) ("We are of the opinion that since no judgment was rendered by the court based on jury findings in questions one and two that any error in those questions was harmless.") and *Venture v. UTSW DVA Healthcare, LLP*, No. 05-14-00774-CV, 2015 WL

5783696, at *4 (Tex. App.—Dallas Oct. 5, 2015, pet. filed) ("[Appellant] does not explain how a jury finding that does not result in any damages or support the attorney's fees award could constitute anything more than harmless error, if it were error at all.").

We overrule issues 1 through 5.

## OTHER CLAIMS

### Prejudgment Interest

In issue 9, Marinecorp contends "the trial court should not have awarded Chopper and Outlaw pre-judgment interest because the alleged damages were not definitely determinable at a definite time." This issue, however, was not raised at trial, thus is not preserved for appeal. *See* TEX. R. APP. P. 33.1.

We overrule issue 9.

### Failure to Award Damages to Marinecorp

In issue 10, Marinecorp contends that "[t]he trial court should have awarded Marinecorp damages for Miller and Tones' breach of the subject guaranty agreements." Marinecorp points out that the jury found that Outlaw failed to comply with the lease and that its failure was not excused, but the trial court, nonetheless, declined to award it damages. In issue 12, Marinecorp contends that "[t]he trial court should have entered judgment against Miller for the full amount of the principal and interest owing on his promissory note payable to Marinecorp."

21

Marinecorp argues that the jury found just $15,000 in damages, while the evidence supported a finding of $53,000. The trial court did not award any damages, either the $15,000 found by the jury or the $53,000 claimed by Marinecorp.

The Texas Rules of Appellate Procedure require that a brief "contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1(i). The appellate court has no duty to brief issues for an appellant. *Huey v. Huey*, 200 S.W.3d 851, 854 (Tex. App.—Dallas 2006, no pet.). In the absence of appropriate record citations or a substantive analysis, a brief does not present an adequate appellate issue. *WorldPeace v. Comm'n for Lawyer Discipline*, 183 S.W.3d 451, 460 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (failure to offer argument, citations to record, or citations to authority waives issue on appeal); *Devine v. Dallas Cnty.*, 130 S.W.3d 512, 513–14 (Tex. App.—Dallas 2004, no pet.) (appellate waiver when a party fails to adequately brief a complaint, he waives the issue on appeal); *see also Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284–85 (Tex. 1994) (stating appellate court has discretion to deem points of error waived due to inadequate briefing). An appellant must discuss the facts and the authorities relied upon as may be requisite to maintain the point at issue. *Tesoro Petroleum Corp. v. Nabors Drilling USA, Inc.*, 106 S.W.3d 118, 128 (Tex. App.—Houston

22

[1st Dist.] 2002, pet. denied). "This is not done by merely uttering brief conclusory statements, unsupported by legal citations." *Id.*

In neither issue does Marinecorp provide any argument or authority to support its claim that the trial court erred in not rendering a judgment in its favor on these issues. Thus, the issues are waived on appeal. Accordingly, we overrule issues 10 and 12.

**Cumulative Damages**

In issue 11, Marinecorp contends the "trial court should not have rendered judgment for cumulative damages for concurrent causes of action arising out of the same acts." Though its argument is somewhat unclear, Marinecorp seems to argue two things under this issue: (1) that categories of damages in the breach of contract damages question are duplicated in the DTPA question and (2) that the categories of damages in the DTPA question are for the same injury. We will address each issue respectively.

Jury question number 6—the breach of contract damages question— included two categories of damages entitled "remedial damages" and "loss of income" damages. Jury question 16—the DTPA damages question included two categories of damages entitled "expenses" and "loss of use." Marinecorp contends that the "remedial damages" in the breach of contract question are duplicative of the "expenses" damages in the DTPA question, and that "loss of income" in the

breach of contract question are duplicative of the "loss of use" questions. Marinecorp argues that Chopper and Outlaw cannot recover the same damages for the same injury and that they cannot "recov[er] more than once for the same injury." However, as acknowledged by Marinecorp in its brief, the damages in the Modified Final Judgment were not based on the breach of contract findings, but "were awarded by the court under the DTPA theory of recovery alleged by Appellees." Indeed, although the jury also found "loss of the benefit of the bargain" damages under the DTPA question, the trial court declined to award the damages found in that category, thus confirming that the damages in the Modified Final Judgment were based on the DTPA violations, not the contract. Because the Modified Final Judgment is based only upon the DTPA findings, there is no "double recovery" based on the breach of contract findings, and, error, if any, in the categories of damages submitted under jury question 6 is harmless.

Marinecorp also complains that the categories of damages submitted in the DTPA damage question—"expenses" and "loss of use"—are duplicative. Marinecorp further contends that "[a]ppellees should not be entitled to both types of damages because the wrongful conduct alleged against Marinecorp would have resulted in the same consequence of Appellees' inability to generate revenue."

Jury question 16—the DTPA question—submitted the following three categories of damages:

24

*Loss of the benefit of the bargain*

The difference, if any, in the value of the premises as received and the value it would have had if it had been as represented.

*Expenses*

The expenses incurred by The Chopper Group in constructing and equipping the lease premises in order to operate.

*Loss of Use*

The reasonable value of the lease premises for the time the Chopper Group was unable to operate due to Marinecorp's conduct.

As mentioned earlier, the trial court did not award any of the damages that the jury found in the "loss of the benefit of the bargain" category. The definitions in the "expenses" category are clearly different from those in the "loss of use" category. Expenses includes money spent by the appellees, while loss of use compensates for the time the appellees were unable to operate their businesses. While the same conduct may have caused both types of injuries, the injuries are not the same. Thus, it was not error to submit both "expenses" and "loss of use" in jury question 16.

Finally, Marinecorp contends that the trial court erred in awarding damages to Outlaw based on jury question 16 because the definitions of "expenses" and "loss of use" did not include Outlaw, even though there was a blank to find Outlaw's damages and the jury did so.

Marinecorp, however, did not complain about this to the trial court, thus, the argument is not preserved for appeal. *See* TEX. R. APP. P. 33.1.

We overrule issue 11.

**Sufficiency of Evidence on Damages**

In issue 13, Marinecorp contends that "[t]he evidence does not support the jury's answers awarding Chopper and Outlaw damages for loss of the benefit of the bargain; remedial damages; expenses; loss of income; loss of use; and wrongful eviction because there was no evidence or insufficient evidence to support these findings of damages."

We again note that the trial court did not award any breach of contract damages, so to extent that Marinecorp challenges the sufficiency of loss-of-the-benefit-of-the-bargain damages, remedial damages, loss-of-income damages, and wrongful eviction damages, error, if any, in the jury's findings is harmless and did not result in an adverse judgment. *See GuideOne Lloyds Ins. Co.*, 268 S.W.3d at 839. Thus, we review only the sufficiency of the evidence to support the damages for DTPA, i.e., expenses and loss of use.

The test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the verdict

and indulge every reasonable inference to support it. *Id.* at 822. We credit favorable evidence if a reasonable juror could and disregard contrary evidence if a reasonable juror could not. *Id.* at 827. Because jurors are the sole judges of the credibility of witnesses and *may* choose to believe one witness and disbelieve another, we must not substitute our opinion for that of the jury. *See id.* at 819. It is the role of the jury to resolve conflicts in the evidence; accordingly, we must review the evidence in a light favorable to the verdict and assume that jurors resolved all conflicts in accordance with that verdict. *Id.* at 820.

In evaluating a factual sufficiency challenge, we consider and weigh all the evidence in a neutral light and will set aside the finding only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *See Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). We also review the evidence for factual sufficiency when determining whether damages are excessive. *See Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex. 1998). The jury generally has great discretion in considering the evidence relevant to the issue of damages. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986); *City of Houston v. Howard*, 786 S.W.2d 391, 395 (Tex. App.—Houston [14th Dist.] 1990, writ denied).

*Expenses*

Regarding Chopper, Marinecorp contends that there is legally and factually insufficient evidence to support the jury's finding of $110,000 in expenses, as that term is defined in the charge. It points out that very few checks were cut on the Chopper's bank account before it opened, and that its weekly reports and bank statements that were introduced into evidence by Chopper in support of its damages "were wholly unreliable," and that Miller "lacked credibility." However, it is the sole province of the jury to determine credibility and the weight to be given to evidence. *See City of Keller*, 168 S.W.3d at 819–20.

Tones, Chopper's investor, testified that he wrote checks totaling over $30,000 towards the Chopper renovation. The checks are included in the record. Chopper also had a trial exhibit entitled "Weekly Expenses," which showed that between May 22, 2010, and August 4, 2010, Chopper spent over $110,000 for labor and materials to build out and prepare Chopper to open for business. The trial exhibit with its totals is accompanied by receipts that correspond to the listed expenses. Leaving the credibility issues to the jury, as we must, we conclude that there is legally and factually sufficient evidence to support the jury's finding that Chopper was entitled to recover $110,000 in expenses.

Similarly, for Outlaw, there was testimony that the renovations to convert the space from an abandoned Walgreens to a functioning country/western venue

cost approximately 2 million dollars. Miller testified that he and Tones spent over $550,000 out of pocket, and that the renovations totaled over 2 million dollars. The weekly expense reports showed expenses of $174,000 between September 18, 2010 and November 27, 2010. As mentioned before, the credibility of the witnesses and the weight given to the evidence lies within the sole province of the jury. *See City of Keller*, 168 S.W.3d at 819–20.

Marinecorp also testified that it should have received an offset of $194,994 for the money it provided toward the Outlaw build-out. However, in light of the fact that the jury found only $150,000 in expenses by Outlaw, despite its testimony that the build-out cost 2 million dollars, we cannot conclude that the jury failed to account for any contribution Marinecorp made to the Outlaw build-out. Again, leaving the credibility issues to the jury, as we must, we conclude that there is legally and factually sufficient evidence to support the jury's finding that Outlaw was entitled to recover $150,000 in expenses.

*Loss of Use*

The charge defined loss of use as "the reasonable value of the lease premises for the time [the tenant] was unable to operate due to Marinecorp's conduct." The jury awarded Chopper $100,000 and Outlaw $140,000. Again, Marinecorp contends that Chopper's and Outlaw's evidence of damages was "unreliable," "not based on objective facts, accurate figures and data," and "without support of

29

corroborating evidence." Marinecorp further points to "discrepancies" in appellees' accounting as shown on their weekly reports. Again, the credibility of the witnesses and the weight given to the evidence lies with the sole province of the jury. *See City of Keller*, 168 S.W.3d at 819–20.

There was evidence that, before they were "locked out" by Marinecorp, Chopper was operating profitably and Outlaw Country was breaking even. Chopper's monthly deposits exceeded $30,000 and $50,000 for several months. Outlaw was bringing in $9,100 on a typical night of sales. On the night of a large concert like the planned Tracy Lawrence concert, Outlaw could bring in over $25,000 in a single night. Outlaw had regular monthly deposits between $30,000 and $54,000. Based on this income history, the jury could have concluded based on Marinecorp's acts that delayed Outlaw's opening and kept both Outlaw and Chopper from operating at all after the lock out, that appellees suffered damages in the amount awarded.

Leaving the credibility issues to the jury, as we must, we conclude that there is legally and factually sufficient evidence to support the jury's finding that Chopper was entitled to recover $150,000 and Outlaw was entitled to recover $140,000 in loss of use damages.

We overrule issue 13.

## CONCLUSION

We affirm the trial court's judgment.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Keyes and Higley.