

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-16-00009-CV
_____

WEIRD TIMES, LLC, APPELLANT

V.

SHARON MA, APPELLEE

On Appeal from the 353rd District Court
Travis County, Texas
Trial Court No. D-1-GN-12-001076; Honorable Scott Jenkins, Presiding

December 6, 2017

## MEMORANDUM OPINION

Before QUINN, C.J., AND CAMPBELL AND PIRTLE, JJ.

This case arises from a dispute between a lessor and lessee in a commercial lease of property located in Travis County, Texas.[1] Appellant, Weird Times, LLC (lessee),

---

[1] Originally appealed to the Third Court of Appeals, this appeal was transferred to this court by the Texas Supreme Court pursuant to its docket equalization efforts. TEX. GOV'T CODE ANN. § 73.001 (West 2013). Should a conflict exist between the precedent of the Third Court of Appeals and this court on any relevant issue, this appeal will be decided in accordance with the precedent of the transferor court. TEX. R. APP. P. 41.3.

appeals from a judgment in favor of Appellee, Sharon Ma (lessor), on her counterclaim for breach of their commercial lease agreement following the bench trial of an action originally filed by Weird Times based, in part, on a theory of breach of an implied warranty of suitability. The trial court awarded Ma a judgment for $885,556.07 in past-due and accelerated rent and $142,404.30 in attorney's fees. In a single issue stated in two parts, Weird Times asserts the trial court erred in its determination that (1) Ma did not breach an implied warranty of suitability owed to Weird Times and (2) that Ma did not forfeit her right to complain about Weird Times's failure to pay rent and property taxes due to that alleged breach. Because we find that Weird Times waived its right to an implied warranty of suitability from Ma, we affirm the trial court's judgment.

BACKGROUND

Ma owns commercial property located at 12408 North MoPac Expressway in Travis County, Texas ("Mopac property"). Since the early 1980s, Ma and her tenants operated the property as a restaurant with outdoor seating. When the property was annexed by the City of Austin in 1984, its use as a restaurant was "grandfathered in" rather than requiring that it meet current code requirements for the City. In 2009, Jesse Fortney, part owner of Weird Times, visited the Mopac property to assess whether the property would be suitable for operating a restaurant and outdoor patio bar with live music. After Fortney performed his "due diligence,"[2] Ma leased the Mopac property to Weird Times pursuant to a commercial lease agreement effective September 1, 2009. Fortney

_____

[2] As part of his due diligence, Fortney visited Glenn Rhoades at the City of Austin Development Assistance Center. In response to Fortney's query whether "there were any big red flags associated with the Mopac property," Rhoades responded that if he planned to have music outdoors, he would need an outdoor music permit. Rhoades also advised Fortney that if additional seating were added to the restaurant, the property would be subject to current code requirements for parking, i.e., one parking space for every seventy-five square feet added to the restaurant.

negotiated the terms of the lease in thirty minutes without the assistance of an attorney to review it.

On January 14, 2010, Ma and Weird Times executed a (*Revised*) Commercial Lease (hereinafter the "Lease") which was effective September 1, 2009 through August 31, 2011, replacing the first lease agreement. The Lease's terms were substantially the same as the earlier lease with the exceptions of the monthly rent and rental term. Section Four of the Lease stated that "LESSEE shall use the lease premises as a restaurant including the sale of alcoholic beverages and no other."[3] Section Five provided that Weird Times agreed "to indemnify and hold harmless [Ma] from any *fine, code violation or other penalty resulting from* [Weird Times's] *use of the premises*." (Emphasis added). Section Eight provided that Weird Times acknowledged it had fully inspected the leased premises and accepted them in their "as is" condition, accepted the leased premises as suitable for the purposes for which they were leased, and acknowledged that Ma made no representations or warranties regarding the leased premises, except as expressly provided in the Lease. According to the terms of the Lease, Weird Times was responsible to keep the roof, foundation, and exterior walls in good repair and condition as well as take "good care" of the leased premises and make all necessary repairs. At the end or other termination of the Lease, Weird Times was responsible for "deliver[ing] up the leased premises with all improvements and fixtures located thereon in good repair and condition, reasonable wear and tear . . . only excepted."

---

[3] Ma testified at trial that she leased the Mopac property for use as a restaurant in accordance with its GR zoning, a permissive commercial zoning classification. Under a GR zoning classification, Ma and any tenants were authorized to serve beer, wine, and mixed drinks in the restaurant. Music indoors was allowed without a permit.

Section Ten provided that "[Weird Times] agree[d] to indemnify and save [Ma] harmless . . . from all liabilities, *fines* . . . claims, demands and actions of any kind . . . [and] shall indemnify and hold [Ma] harmless . . . from any and all *damages or liability for anything arising from or out of the condition of the premises or the occupancy thereof by [Weird Times].*" (Emphasis added). Section Fifteen provided that "[i]f Lessee defaults in the performance of any obligations or covenants herein, [Ma] may enforce the performance of this lease in any manner provided by law." Under the Lease, Weird Times was responsible for the payment of monthly rent, real property taxes after the first year, attorney's fees in the event Ma filed an action for the enforcement of any agreement contained in the Lease, and penalties for late payment of rent. Furthermore, section Twenty-three provided that the Lease "constitute[d] the sole and only agreement of the parties hereto and supersede[d] any prior understandings or written or oral agreements between the parties respecting the within subject matter."

In January 2010, Weird Times opened a restaurant with an outdoor patio bar and live music called "Weirdos." Business boomed.[4] At one event, there were 800 people by noon with gross sales of $30-50,000 for the day. In May 2010, there was a particularly large event that drew a crowd of 1,500 people. Thereafter, City officials visited Weirdos and launched investigations into Weird Times's use of the Mopac property.

---

[4] Fortney testified that he used the Mopac property as a "cocktail lounge" from opening day and beer sales were fifty-one percent of his overall sales. He estimated that from January to February, Weirdos brought in $120,000 to $150,000 per month. In March through April, when the weather warmed up, Weirdos brought in between $250,000 to $300,000 per month. In May, Weirdos brought in between $350,000 and $400,000. He testified "[p]rofits doubled, tripled, it was amazing." He estimated Weirdos was selling more beer in one week than the prior tenant sold in a year. Cecilia Fortney, part owner and bookkeeper for Weird Times, testified that "[f]rom the time they began operations until they were evicted, in excess of fifty-one percent of their sales came from alcohol." In her opinion, they had a bar but operated as a restaurant. Under the City's zoning regulations, a "cocktail lounge" was an establishment whose sale of alcoholic beverages was fifty-one percent of its gross revenue.

In June 2010, the City cited Weird Times for various violations of code ordinances.[5] After a meeting with City officials, Fortney understood that in order to continue operating the Mopac property primarily as an outdoor patio bar, Weird Times would need to rezone the Mopac property as a "cocktail lounge," obtain an approved site plan, and a continuous use permit.[6]

Weird Times retained counsel after receiving notice of the code violations. Its attorney advised Weird Times that it was "operating outside the lease as a cocktail lounge and not a restaurant." He also advised Weird Times to amend the Lease because it did not cover Weird Times's use of the Mopac property. Thereafter, Weird Times's attorney drafted an amendment to the Lease. According to Fortney, the amendment "[a]ccurately describe[d] how [Weird Times] was using the property in 2010." Fortney testified that the Lease amendment was the "beginning to get all the necessary permits and zoning" and it "allowed him to approach the City about obtaining permits and site plans so that [Weird Times] could have a restaurant/bar and outdoor music venue." Ultimately, Weird Times's approval process did not move beyond the submission of a site plan and issuance of a

---

[5] The City's acting director of code compliance cited Weirdos for the following violations: (1) operating a cocktail lounge and outdoor sports/recreation venue without proper approvals and permits, (2) development and use of areas of the property without a site plan, (3) performing construction without permits, (4) operating an outdoor music venue without the required permits, and (5) engaging in alcohol sales that were in excess of those allowed for a restaurant under the City zoning code.

[6] Jim Nias, an attorney hired by Ma, described the City's approval process as follows: To operate a cocktail lounge, proper zoning was required along with a conditional use permit. After application is made to rezone the property, a public hearing with notice to surrounding property owners must be held after which a City commission votes to accept or reject the proposed zoning. If accepted, the applicant must submit a site plan for the property. If the site plan's conditions such as restrictive covenants and easements are met, the applicant must obtain the City's approval for the site plan to be released. Once released, the applicant submits construction plans which, if approved, will allow for the issuance of building permits to implement the plan or "build out" the plan. Numerous inspections during the construction phase such as foundation, electrical, plumbing, framing, etc., must be passed as the plans are implemented. Finally, a certificate of occupancy must be issued certifying that all construction complies with the site plan, construction plans, and applicable codes.

continuous use permit. Aside from the onerous approval process, there was a substantial question as to whether Weird Times could finance a complete "build out" of the proposed plan.

In September 2010, the "First Amendment to (*Revised*) Commercial Property Lease" ("First Amendment") was executed to expand the scope of uses that could be conducted by Weird Times on the Mopac property.[7] Section Four was amended to provide that "[Weird Times] shall use the Leased Premises for the operation of a Restaurant, *Cocktail Lounge and/or Outdoor Entertainment venue (as these are defined in Chapter 25-2 of the City of Austin Land Development Code, as amended)*, operating pursuant to a Texas Alcoholic Beverage Commission licensed beverage . . . permit." (Emphasis added). Section Twenty-eight provided that "[Ma] hereby authorizes [Weird Times] to serve in the capacity of agent for [Ma] for the sole purpose of applying for, processing and obtaining such . . . changes and/or permits as may be required by state and/or local government authorities for [Weird Times's] use of the Leased Premises for the uses provided in [s]ection Four herein." Ma agreed to "perform such future acts as may be required by the State and/or local governmental authorities [for the] issuance of a permit or permits for the purposes stated herein as may be *reasonably* necessary to allow for [Weird Times's] use of the Leased Premises for the uses provided in section Four herein." (Emphasis added). The First Amendment further provided that "should any governmental authority require a zoning change and/or a permit for a use that differs from

---

[7] On March 11, 2011, a second amendment to the Lease entitled "First Amendment To Lease Agreement Between Sharon Ma As Landlord And Weird Times, LLC, As Tenant" was executed extending the renewal period for sixty months commencing September 1, 2013 and ending August 31, 2018, and setting a monthly base for rent plus property taxes during the renewal period (hereinafter the "Second Amendment").

or is addition to the uses permitted in [s]ection Four of the Lease, as amended by this Amendment, or an improvement on the Leased Premises . . . such zoning change and/or permitting shall be the responsibility of [Weird Times] and all costs associated therewith shall be borne by [Weird Times]." The First Amendment stated that the terms and provisions of the Lease, as amended, were ratified and the First Amendment/Lease would be construed as one instrument.

After the First Amendment's execution, Weird Times sought to gain approval from various City agencies to change Weirdos's authorized use from a restaurant to a cocktail lounge. With Ma's cooperation, Weird Times changed the Mopac property's zoning from GR which permitted a restaurant serving mixed drinks with music inside to CS-1 which permitted the operation of a cocktail lounge. Under the CS-1 classification, a separate permit was required for outdoor music.[8]

In May 2011, Ma and Weird Times entered into a second lease for an adjacent property owned by Ma (the "O'Neal property"). The lease provided that Weird Times "shall use the leased premises as a restaurant including the sale of alcoholic beverages and no other." With the exception of the "use" provision, monthly rent, lease duration, and subject matter, the terms of the O'Neal lease were the same as the Lease. After the O'Neal property lease was executed, City officials informed Weird Times that the property could not be used for parking until such time as the City approved a new site plan governing the property's use. Thereafter, according to Fortney, Ma "allowed them to cancel the lease" when there was a $23,000 rent shortfall. After its termination, Weird

---

[8] In March 2011, the City cancelled Weirdos's one-year music permit but, according to Fortney, "[t]hey were floating off of how busy they were, we had huge sales, so we were still doing okay."

Times never paid the shortfall and considered itself to have no future obligations to Ma with regard to the O'Neal lease.

During the site plan approval process, City officials requested a drainage easement to encompass that portion of the Mopac property within a 100-year floodplain demarcated by FEMA. If executed, the drainage easement would encumber one-third of the property, require modifications to the existing structures or flood proofing, and likely prevent any redevelopment within the floodplain. Although there were possible alternatives to granting the City an easement,[9] Weird Times insisted that Ma execute the City's drainage easement form.

Ma's decision not to sign the City's easement form was supported by her attorney, Jim Nias. In his opinion, what was being requested of Ma was unreasonable. Nias's biggest concern was how the easement would affect future development of the Mopac property. In his opinion, the main building, currently in use by Weirdos, was not the highest and best use of the property. In addition, Weird Times was in default on the Lease because it was behind in rent and had not paid any property taxes. He characterized Weird Times as an unreliable tenant and believed that if Ma encumbered one-third of her property for Weird Times's benefit and Weirdos was unable to make it financially or succeed with the redevelopment of the Mopac property, Ma would be damaged by having her property encumbered by the easement. He also interpreted the Lease/First

_____

[9] Sarah Crocker, a land development consultant in Austin, testified that one alternative would be to obtain a letter of map amendment from FEMA and take the property out of the floodplain. If there was an error in FEMA's floodplain study which, according to Crocker, was only an estimation of its location and might not include the Mopac property, FEMA might take the property out of the floodplain. Another alternative would be to alter the property's landscape to accommodate the floodplain without creating an easement.

Amendment to require that Weird Times absorb any costs associated with exploring alternatives to granting the City an easement.

In December 2011, Ma's attorney sent Weird Times a letter indicating that it was delinquent in paying rent ($24,500) and property taxes ($15,398.13) for a total of $39,898.13. In January 2012, Weird Times hired David Cancialosi, an expert in commercial land use and development in Austin. At the time, Weirdos's outdoor deck, bar, and stage had not been approved by the City and were within the floodplain. He testified he negotiated an agreement with the City whereby it would accept a drainage easement that allowed the noncompliant structures on the Mopac property to be exempt from the drainage easement. In his opinion, the drainage easement with the City's agreement to exempt noncompliant structures was a reasonable requirement.

In March 2012, City officials issued a Continuous Use Permit to Weird Times. As for the site plan, Cancialosi indicated that one of the City's biggest concerns was that Weirdos had built the stage behind the deck without any permits and without Ma's permission. Weird Times also built a structure containing two or three walk-in coolers without permits. Crocker testified that a client makes matters worse throughout the redevelopment process when they approach the City already having code-compliant issues ("red-flag client"). She testified that "[c]redibility is everything" and "[i]f [City officials] believe you aren't going to follow through with deadlines, they aren't going to work with you." She also doubted whether the site plan would be approved even if Ma signed the easement form.[10]

---

[10] Weird Times's final site plan showed 138 parking spaces. Crocker opined that because Weird Times sought approval of a 14,000-square-foot cocktail lounge, the necessary number of parking spaces, (closer to 200 spaces or more) was unattainable given the layout of the Mopac property.

In April 2012, a meeting between Weird Times and Ma was scheduled. At the meeting, Weird Times paid past-due rent but did not pay delinquent property taxes. Weird Times conditioned full payment of the overdue amounts on Ma's signing the City's easement form. The form did not contain any language regarding the exclusion of existing buildings from the floodplain's footprint. Ma refused. Despite being in default under the Lease, Weird Times decided it would continue to withhold rent and property taxes so long as Ma would not sign the City's form, and in May 2012, Weird Times ceased paying rent altogether.

In July 2012, Ma placed the Mopac property on the market for $3,000,000. Fortney learned the property was up for sale and offered Ma $1,200,000. He estimated conservatively that in addition to the purchase price, Weird Times would have to put approximately $1,200,000 into the property and would net $1,000,000 per year in profit.[11] Although Fortney attempted to interest other investors, he was unsuccessful. At the time, Ma was unable to sell the Mopac property.

In January 2013, Ma's attorney obtained an order of eviction.[12] On January 22, Weirdos operated through the night before being evicted the next day. When Ma and the sheriff arrived, door handles were missing and fixtures had been ripped out of the walls. Ma's attorney described the property as "filthy" and a "disaster area" with beer bottles strewn over the property. A bid for the cost to repair the damage and return the property

___

[11] Fortney estimated Weird Times could make $50,000 to $200,000 per month and easily reach an annual profit of $1,000,000.

[12] The eviction occurred after a final judgment was rendered by the Justice Court for Precinct Two of Travis County authorizing Weirdos's eviction and awarding possession of the Mopac property to Ma. In January 2013, the Travis County Constable for Precinct Two executed a Writ of Possession in accordance with the judgment of the Justice Court.

back to the condition necessary to operate as a restaurant was $350,000. Crocker testified that, since Weird Times's eviction, the Mopac property has been vacant because Weird Times's outstanding code violations "run with the property," and until the code violations were cleared, Ma could not get electricity on the property.

In April 2013, Weird Times filed its *Original Petition* and in January 2015, filed its *Second Amended Petition* alleging actions against Ma for common law fraud, statutory fraud, breach of contract, deceptive trade practices, breach of an implied warranty of suitability, negligence, and principal-agent liability. It also requested a declaratory judgment concerning Ma's purported breach of the Lease. In March 2015, Ma filed her *Third Amended Answer, Special Exceptions, Verified Denials, Affirmative Defenses and Counterclaims* wherein she asserted the affirmative defenses of failure of consideration, breach of contract, unclean hands, contributory negligence, fraud, waiver, ratification, proportionate responsibility, set off, estoppel, res judicata, and fraud in the inducement. In her counterclaim, Ma asserted actions for breach of the Lease, conversion, fraud in a real estate transaction, common law fraud, negligent misrepresentation, unjust enrichment, promissory estoppel, and breach of fiduciary duty. She too sought a declaratory judgment with respect to the rights, status, and legal relations between the parties.

A four-day bench trial was held in March/April 2015. In September, the trial court issued its final judgment concluding that Weird Times's claims were without merit and that it "take nothing." The trial court found in favor of Ma on her breach of Lease claim and awarded her $885,556.07 for past-due and accelerated rent. She was also awarded $142,404.30 in attorney's fees, with an additional sum of $40,000 in the event of a

successful appeal. The trial court subsequently issued its *Findings of Fact and Conclusions of Law*.[13] Specifically, the trial court entered a fact finding that "Ma did not breach any Implied Warranty of Suitability with respect to her lease of the Mopac Premises." Based in part on that fact finding, the trial court also entered conclusions of law that Weird Times should take nothing by its claims against Ma and that Ma should instead recover damages from Weird Times.

On appeal, Weird Times asserts that the evidence at trial conclusively established that Ma breached the implied warranty of suitability owed to it under the Lease, thereby entitling it to damages and a finding that, as a matter of law, Ma's claim for breach of the Lease is unfounded. Weird Times asks this court to reverse the trial court's judgment, render judgment in its favor that Ma take nothing by her claims, and award the damages sought by it at trial.[14]

STANDARD OF REVIEW

Findings of fact entered in a case tried to the bench have the same force and dignity as a jury's verdict upon questions. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). Those findings, however, are not conclusive when a complete statement of facts appears in the record, if the contrary is established as a matter of law, or if there is no evidence to support the findings. *Estate of Norma L. Bessire,* 399 S.W.3d 642, 648 (Tex. App.—Amarillo 2013, pet. denied); *Zenner v. Lone Star Striping & Paving, L.L.C.*, 371 S.W.3d 311, 314 (Tex. App.—Houston [1st Dist.] 2012, pet. denied). A trial

---

[13] Weird Times does not challenge the trial court's findings of fact. As such, its findings of fact have been incorporated into our statement of the background of this appeal.

[14] Weird Times does not appeal the trial court's calculation of damages or attorney's fees awarded to Ma.

court's findings of fact are reviewable by the same standards applied in reviewing the sufficiency of the evidence supporting a jury's finding. *Anderson*, 806 S.W.2d at 794. The trial court's conclusions of law based on its findings of fact are, however, reviewed *de novo* to determine their correctness. *Choice! Power, L.P. v. Feeley,* 501 S.W.3d 199, 208 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (citing *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794-95 (Tex. 2002)).

In conducting a legal sufficiency review, we must consider the evidence in the light most favorable to the challenged finding, indulge every reasonable inference in support of it; *City of Keller v. Wilson,* 168 S.W.3d 802, 822 (Tex. 2005); *Haggar Clothing Co. v. Hernandez*, 164 S.W.3d 386, 388 (Tex. 2005) (citing *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998)), and credit favorable evidence if reasonable jurors could while disregarding contrary evidence unless reasonable jurors could not. *City of Keller*, 168 S.W.3d at 827. A challenge to the legal sufficiency will be sustained when, among other things, the evidence offered to establish a vital fact does not exceed a scintilla. *Kroger Tex. Ltd. P'ship v. Suberu,* 216 S.W.3d 788, 793 (Tex. 2006).[15] In addition, so long as the evidence falls within the zone of reasonable disagreement, we may not invade the role of the fact finder who alone determines the credibility of the witnesses, the weight to be given their testimony, and whether to accept or reject all or part of their testimony. *City of Keller*, 168 S.W.3d at 822.

---

[15] Less than a scintilla of evidence exists when the evidence is so weak as to do no more than create a mere surmise or suspicion of fact. *King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 751 (Tex. 2003), *cert. denied,* 541 U.S. 1030, 124 S. Ct. 2097, 158 L. Ed. 2d 711 (2004).

The construction of an unambiguous contract is a question of law for the court to consider under a *de novo* standard of review. *See Chrysler Ins. Co. v. Greensport Dodge of Houston, Inc.*, 297 S.W.3d 248, 252 (Tex. 2009). *See also DeWitt County Elec. Coop., Inc. v. Parks,* 1 S.W.3d 96, 100 (Tex. 1999) (a contract is unambiguous if it can be given a definite or certain meaning). When interpreting a contract, our primary concern is to ascertain and give effect to the intent of the parties as expressed in the contract. *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006). "To discern this intent, we examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Id.* The parties' intent may also be determined by considering the construction the parties placed on the contract as evidenced by their conduct. *Consolidated Engineering Co., Inc. v. Southern Steel Co.,* 699 S.W.2d 188, 192-93 (Tex. 1985). That said, however, extrinsic evidence may not contradict or vary the meaning of the explicit language of the written contract. *Nat'l Union Fire Ins. Co. of Pittsburgh, Penn. v. CBI Indus., Inc.*, 907 S.W.2d 517, 521 (Tex. 1995).

Under the doctrine of incorporation by reference, one agreement may properly constitute part of another agreement if one agreement references the other. *Santander Consumer USA, Inc. v. Mata,* No. 03-14-00782-CV, 2017 Tex. App. LEXIS 2631, at *5 (Tex. App.—Austin March 29, 2017, no pet.) (mem. op.); *Teal Constr. Co. v. Darren Casey Interests, Inc.*, 46 S.W.3d 417, 420 (Tex. App.—Austin 2001, pet. denied). The language in one agreement must plainly refer to the other agreement or otherwise show

that the parties intended for one agreement to become a part of or be incorporated into the other agreement. *Mata,* 2017 Tex. App. LEXIS 2631, at *6*. See Bob Montgomery Chevrolet, Inc. v. Dent Zone Companies*, 409 S.W.3d 181, 189 (Tex. App.—Dallas 2013, no pet.) (incorporating language is not important so long as the signed document "plainly refers" to the incorporated document). Documents incorporated into a contract by reference become a part of that contract; *In re 24R, Inc.*, 324 S.W.3d 564, 567 (Tex. 2010) (orig. proceeding) (*per curiam*) (citing *In re Bank One, N.A.*, 216 S.W.3d 825, 826 (Tex. 2007) (orig. proceeding)), and both instruments must be read and construed together. *In re C & H News Co.*, 133 S.W.3d 642, 645-46 (Tex. App.—Corpus Christi 2003, orig. proceeding).

Here, the Lease provided that amendments were valid if they were in writing, dated subsequent to the Lease, and duly executed by the parties. The parties executed two amendments to the Lease that complied with these requirements. The First Amendment stated that "[t]he terms and conditions of the Lease, as amended . . . are hereby modified and confirmed, and this First Amendment and the Lease shall be construed as one instrument." The Second Amendment provided the Lease "shall remain in full force and effect and all the terms, provisions, covenants and conditions thereof are hereby ratified and confirmed." Accordingly, the language of the two amendments plainly incorporated and/or ratified the Lease's terms and the Lease and its amendments may be read as a single document.

IMPLIED WARRANTY OF SUITABILITY

In a commercial lease, the lessor makes an implied warranty that the premises are suitable for the commercial purpose intended by the parties. *Italian Cowboy Partners,*

*Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 340 (Tex. 2011) (citing *Davidow v. Inwood N. Prof'l Group—Phase I*, 747 S.W.2d 373, 377 (Tex. 1988)). Specifically, a lessor impliedly warrants that at the lease's inception, no latent defects exist that are vital to the use of the premises for its intended commercial purpose. *Id.* In order to establish a breach of this implied warranty of suitability, a lessee must show that a latent defect in the facilities existed at the inception of the lease, that the facilities were vital to the use of the premises for the intended purpose, and that the lessor failed to repair or correct the defect. *Id.* However, if "the parties to a lease expressly agree that the tenant will repair certain defects, then the provisions of the lease will control." *Id.* (quoting *Davidow*, 747 S.W.2d at 377). A claim for breach of the implied warranty of suitability is a complete defense to nonpayment of rent; *McGraw v. Brown Realty Co.*, 195 S.W.3d 271, 276 (Tex. App.—Dallas 2006, no pet.), because a lessee's obligation to pay rent and a lessor's implied warranty of suitability are mutually dependent. *Davidow*, 747 S.W.2d at 377.

Absent fraud in the inducement, the implied warranty of suitability may be contractually waived. *Italian Cowboy*, 341 S.W.3d at 340. An "as is" provision can waive claims based on the condition of the property. *Gym-N-I Playgrounds, Inc. v. Snider*, 220 S.W.3d 905, 912 (Tex. 2007). Specifically, an "as is" clause negates the implied warranty of suitability itself; *id.* at 910, and a tenant waives latent defects if he takes the premises "as is" or expressly assumes the obligation to repairp. *Id.* at 911. *See Lee v. Perez*, 120 S.W.3d 463, 467-68 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (noting that an "as is" clause may waive implied warranties but concluding that contract clause in that case did not waive the deed restriction defect at issue because the scope of the "as is" clause was limited to *physical conditions* on the property). Whether there has been an actionable breach of the implied warranty of suitability is determined on a case-by-case basis.

16

*Davidow*, 747 S.W.2d at 377. Accordingly, we begin with the plain language of the Lease to determine the extent, if any, to which the Lease may have relieved Ma from liability for any implied warranty of suitability.

Even if Weird Times is correct in its assertion that a zoning or code violation is a "latent" defect in the property, the language of the Lease clearly relieves Ma from any liability for the breach of an implied warranty of suitability. In section Eight of the Lease, Weird Times "acknowledged that [it had] fully inspected the leased premises and accept[ed] the leased premises in their 'as is' condition." Section Eight also provided that Weird Times "*hereby accepts the leased premises as suitable for the purposes for which same are leased"* and *"acknowledge*[s] *that* [Ma] *makes no representations or warranties regarding the leased premises, except as expressly provided herein*." (Emphasis added). Consistent with the language in section Eight, Weird Times agreed in section Ten "to indemnify and save harmless [Ma] . . . of and from all liabilities, fines . . . claims, demands and actions of any kind [and] from any and all damages or liability for anything arising from or out of the condition of the premises *or* the occupancy thereof by [Weird Times]." (Emphasis added).

That the Lease contained an express waiver of any implied warranty of suitability by Ma is also evidenced by the parties' conduct. During the course of the Lease, Weird Times assumed full responsibility for obtaining a proper zoning classification for its use of the Mopac property as a cocktail lounge and obtaining an approved site plan from the City. Weird Times coordinated and negotiated with City officials, paid for required improvements to the Mopac property, paid permit and inspection fees, hired firms to assist it in its quest for alternative zoning and redevelopment approvals, and asked Ma to

17

contribute to the necessary construction if its site plan was approved. Weird Times never sought payment from Ma for any expenses for City approvals or construction until *after* it was evicted from the Mopac property for failing to pay overdue rent and property taxes.

Alternatively, Weird Times asserts Ma breached the First Amendment by unreasonably withholding her signature from the City's drainage easement form, a document regarded as necessary to the City's approval of Weird Times's site plan. However, the only evidence offered by Weird Times on this issue at trial was the opinion of its expert that the drainage easement was a reasonable requirement by the City. Ma's attorney disagreed, however, and opined that Ma's refusal to sign the easement form was reasonable because Weird Times was an unreliable tenant who was behind in its payment of rent and property taxes, the easement covered more than a third of the Mopac property, the easement would likely prevent future development on the property, and even if the buildings with footprints in the floodplain were excluded from the City's easement, they were quite dated and did not represent the highest and best use of the Mopac property. Furthermore, the trial court's judgment is an indication that, as fact finder, it gave little weight to the opinion of Weird Times's expert. *See City of Keller*, 168 S.W.3d at 822; *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1997).

Weird Times also points to statements made by Ma's son regarding the use of the Mopac property by prior tenants. Weird Times asserts the original lease supported its assertion that the term "restaurant" included an outdoor bar and live music venue. That the First Amendment was agreed to by the parties belies this assertion because the purpose of the amendment was to expand the uses permitted under the Lease to include a "Cocktail Lounge and/or Outdoor Entertainment venue." In addition, we cannot consider

18

extrinsic evidence that would alter or contradict a term of the Lease regarding use, i.e., interpret the word "restaurant" to also mean "cocktail lounge" or "outdoor bar and live music venue"; *Nat'l Union Fire Ins. Co. of Pittsburgh*, 907 S.W.2d at 521, or ignore section Twenty-three of the Lease that provided the Lease "supersede[d] any prior understandings or written or oral agreements between the parties."

Because we find Weird Times waived any implied warranty of suitability, we further find that the overwhelming weight of the evidence supports the trial court's finding that Ma did not breach an implied warranty of suitability owed to Weird Times. Accordingly, we overrule the first part of Weird Times's issue. As a result, the second part of Weird Times's issue (regarding Ma's forfeiture of claims by her alleged breach) is pretermitted. TEX. R. APP. P. 47.1.

CONCLUSION

The trial court's judgment is affirmed.

Patrick A. Pirtle
Justice

19